**CITY OF PHILADELPHIA, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

**Philadelphia Gas Works on its own behalf and by the Philadelphia Facilities Management Corporation, Petitioners,**

v.

**Pennsylvania Public Utility Commission, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 4, 2003.

Decided Aug. 13, 2003.

Daniel Clearfield, Harrisburg, for petitioner.

Shane Rooney, Harrisburg, for respondent.

Philip A. Bertocci, Philadelphia, for intervenors, CEPA, ACORN, TAG and Action Alliance of Sr. Citizens.

BEFORE: COLINS, President Judge, McGINLEY, Judge, SMITH–RIBNER, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

SIMPSON, Judge.

In these consolidated appeals from orders of the Pennsylvania Public Utility Commission (PUC), we are asked whether under the Natural Gas Choice and Competition Act [1] (Gas Choice Act) the PUC can increase Philadelphia Gas Works' (PGW) municipal service rates without approval from Philadelphia City Council. We affirm, holding that City Council approval is not necessary.

The City of Philadelphia (City) is a home rule municipality.[2] The City owns PGW, a collective name for all the real and personal property by which the City furnishes gas to its customers and itself. *See Philadelphia Facilities Management Corp. v. Biester,* 60 Pa.Cmwlth. 366, 431 A.2d 1123 (1981). Philadelphia Facilities Management Corporation manages PGW for the City. *Id.*

Before the Gas Choice Act became effective on July 1, 2000, the Philadelphia Gas Commission exercised regulatory control over PGW. Among other things, the Philadelphia Gas Commission fixed and regulated gas rates consistent with the City ordinances. One of the applicable ordinances was the so-called Management Agreement Ordinance, City Ordinance No. 455, December 29, 1972, *as amended.* Reproduced Record (R.R.) 49a–76a; *see Biester,* 431 A.2d at 1128.

PGW recovers its costs in two ways. R.R. 195a–98a. First, PGW imposes a customer charge, which is a flat fee imposed on each metered account on a monthly basis. This charge recovers expenses associated with being ready and able to serve a particular customer, regardless of how much gas the customer uses. A customer charge addresses expenses for customer billing, personnel and the maintenance of infrastructure. Second, PGW recovers the costs associated

---

**1.** 66 Pa.C.S. §§ 2201–2212.

**2.** The First Class City Home Rule Act, Act of April 21, 1949, P.L. 655, *as amended,* 53 P.S. §§ 13101–13157, authorized the Philadelphia Home Rule Charter, 351 Pa.Code §§ 1.1–100–12.12–503.

with the acquisition of natural gas supply for its customers. This commodity charge varies according to the volume of natural gas used by each metered account. The issue here involves the first charge, the customer charge.

Previously, PGW imposed no customer charge on the municipal service customer class, which includes properties of the City and its school district. R.R. 197a. The municipal service customer class was the only class not paying a customer charge. *Id.* Rates for gas to municipal service customers were subject to approval by City Council. Management Agreement Ordinance, Section VII(3), R.R. 70a.

The Gas Choice Act brought city owned natural gas operations, including PGW, under PUC jurisdiction. 66 Pa.C.S. § 2212(b). Now, the PUC approves rates and charges for PGW. However the Gas Choice Act requires the PUC to "follow the same ratemaking methodology and requirements that were applicable to the city natural gas distribution operation prior to the assumption of jurisdiction by the commission...." 66 Pa.C.S. § 2212(e). The mandate that the PUC follow "the same ratemaking methodology and requirements" is at the core of this dispute.

In 2001, PGW filed a request for a general rate increase of $65,000,000 with the PUC. This was the first base rate case initiated after the PUC assumed jurisdiction over PGW. Among the many details in its filing, PGW proposed a monthly customer charge of $25 for members of the municipal service customer class. R.R. 197a. No conflicting positions were taken by other parties on this aspect of the extensive proposal. *Id.*

The PUC commenced an investigation of the proposed rates. Multiple parties intervened or filed formal complaints against the proposed rates. The filing was referred to an administrative law judge

(ALJ) for hearings and a recommended decision.

After hearings, the ALJ recommended that PGW receive $33,000,000 of its requested $65,000,000 general rate increase. The ALJ also approved various customer charges, but did not specifically address the customer charge for municipal service customers. R.R. 197a.

Exceptions to numerous aspects of the recommended decision were entertained by the PUC. It issued an exhaustive Opinion and Order on October 4, 2001 (First Order), which reduced the total relief to approximately $28,000,000.

Shortly thereafter, PGW filed a tariff supplement to comply with the First Order. However, the tariff supplement did not include a customer charge for the municipal service customer class. After questions from the Office of the Consumer Advocate, PGW claimed for the first time it was unable to impose a customer charge on the municipal service customer class without approval from City Council. R.R. 342a.

In response to a petition for rehearing, the PUC issued an Opinion and Order on December 6, 2001 (Second Order). The Second Order resolved many issues. For present purposes, the Order addressed an apparent calculation error and modified the amount of overall relief to $22,558,000.

PGW submitted a new filing in compliance with the Second Order. However, PGW did not include a customer charge for the municipal service rate class. Both the Office of Consumer Advocate and the Office of Small Business Advocate expressed concerns. By Order of February 21, 2002 (Third Order), the PUC directed that PGW impose a monthly $18 customer charge on the municipal service class. The Third Order also held that the amount of the customer charge applicable to the mu-

nicipal service class would be imputed as a component of PGW's revenue, so as to prevent the shifting of this charge to other rate payers. Third Order at 4.

The City and PGW petitioned for review of the First and Second Orders. A subsequent agreement resolved all issues except the customer charge for the municipal service class and the imputation of revenues associated with it as part of the $22,558,000 in relief.[3]

In ratemaking cases, our review is limited to a determination of whether or not constitutional rights have been violated, or if an error of law has been committed, or whether or not the findings, determinations or order of the PUC are supported by substantial evidence. *Brockway Glass Co. v. Pennsylvania Public Utility Comm'n,* 63 Pa.Cmwlth. 238, 437 A.2d 1067 (1981). This Court should not substitute its judgment for that of the PUC when substantial evidence supports the PUC's decision on a matter within the commission's expertise. *Popowsky v. Pennsylvania Public Utility,* 550 Pa. 449, 706 A.2d 1197 (1997). The PUC's expert interpretation of an aspect of utility law is entitled to great deference and will not be reversed unless clearly erroneous. *Bell Atlantic–Pennsylvania, Inc. v. Pennsylvania Public Utility Comm'n,* 763 A.2d 440 (Pa.Cmwlth.2000), *appeal denied,* 567 Pa. 746, 788 A.2d 378 (2001).

In their consolidated appeals, the City and PGW make multiple arguments which essentially question procedure rather than the amount of relief. First, they argue the PUC failed to follow prior ratemaking methodology by failing to recognize that approval of City Council is a prerequisite to an increase in municipal service class charges. Second, they contend the PUC's construction of the Gas Choice Act violates constitutional and statutory protections of local self-government for home rule municipalities. Third, they argue that the PUC's imputation of revenues for the increased customer charge on the municipal service class deprives it of the full relief awarded.

## I.

■ We reject the contention that the PUC failed to follow prior ratemaking methodology, as specified in the Gas Choice Act. We hold the mandate to follow the same ratemaking methodology and requirements refers to the method of evaluating revenue requirements. The Gas Choice Act does not preserve the legal procedure involving City Council approval of rates for the municipal service class.

The Gas Choice Act provides in relevant part:

(e) **Securities of city natural gas distribution operations.**—Notwithstanding any provision of this title to the contrary, in determining the city natural gas distribution operation's *revenue requirement* and approving overall rates and charges, the commission shall follow *the same ratemaking methodology and requirements* that were applicable to the city natural gas distribution operation prior to the assumption of jurisdiction by the commission, and such obligation shall continue until the date on which all approved bonds have been retired, redeemed, advance refunded or otherwise defeased. However, this section shall not prevent the commission from approving changes in the rates payable by

---

3. Various advocacy groups, including the Consumers Education and Protective Association (CEPA), the Association of Community Organizations for Reform Now (ACORN), Tenants' Action Group (TAG), and Action Alliance of Senior Citizens of Greater Philadelphia, intervened. Collective written argument was received from the advocacy groups. Also, the Office of Consumer Advocate intervened and submitted written argument.

any class of ratepayers of the city natural gas distribution operation so long as the *revenue requirement* and the overall rates and charges are not adversely affected by such changes.

66 Pa.C.S. § 2212(e) (emphasis added). When Section 2212(e) is read in its entirety, it is clear that "requirements" refers to "revenue requirement[s]." In the above quoted portion of Section 2212(e), the phrase "revenue requirement" is used twice, once before and once after the mandate to "follow the same ratemaking methodology and requirements."

PGW's revenue requirements are identified in the Management Agreement Ordinance referenced above. Specifically, Section VII(1) of the Management Agreement Ordinance provides that non-municipal service gas rates shall be fixed so that project revenues will be at least sufficient to cover enumerated expenses for each fiscal year. The enumerated expenses include all operating and maintenance costs, interest and amortization of debt, general expenses, payments to the City, debt reductions and capital additions, working capital, and non-cash expenses included in estimates of revenue requirements. R.R. 66a–70a. The PUC acknowledged the significance of the Management Agreement Ordinance and analyzed its relevant provisions. First Order at 12–13. *See also* R.R. 154a–69a.

This Court previously held the Management Agreement Ordinance specifies the cash flow method as the ratemaking formula for establishing PGW's rates. *Action Alliance of Senior Citizens of Greater Philadelphia, Inc. v. Philadelphia Gas Comm'n*, 45 Pa.Cmwlth. 234, 406 A.2d 1155 (1979). The PUC acknowledged this authority, and it applied a cash flow analysis to the revenue requirements identified in the Management Agreement Ordinance. First Order at 14.

We hold that the approach described above satisfies the Gas Choice Act directive to follow the same ratemaking methodology and requirements. The PUC committed no clear error when it adopted this approach.

The City and PGW highlight another subsection of the Management Agreement Ordinance. Section VII(3) provides, with emphasis added:

> Company shall furnish to the City and the Board of Education, delivered in their various public buildings along the lines of its mains, such amounts of gas as may be required by the City or the said Board. Rates for gas for such public purposes shall be established from time to time by the Gas Commission upon the recommendations of Company *and subject to approval by City Council.*

R.R. at 70a. However, the provision for approval by City Council of municipal service rates is neither a revenue requirement nor a ratemaking methodology. It reflects a political rather than a financial consideration.

There is nothing in the language of Section 2212(e) of the Gas Choice Act that suggests legislative intent to burden ratemaking with non-financial considerations. Indeed, the contrary is true. Moreover, there is no reference to ratemaking among the powers preserved for cities owning gas distribution operations. 66 Pa.C.S. § 2212(s). These omissions are consistent with our conclusion that the Gas Choice Act reposes the ratemaking function solely in the PUC, subject to the condition to follow existing ratemaking methodology and revenue requirements, but not subject to approval by City Council.[4]

---

4. While disposing of this argument on the merits, we note that PGW proposed a custom-er charge on the municipal service class higher than that ultimately adopted by the PUC.

## II.

■ The City and PGW argue that the PUC must interpret the Management Agreement Ordinance in such as way as to preserve the right of local self-government protected by the Pennsylvania Constitution, Art. IX, § 2,[5] and the First Class City Home Rule Act (Home Rule Act).[6] They contend rates for gas service to City and school district buildings are a matter of purely local concern which must remain subject to local approval by City Council.

Both the Pennsylvania Constitution and the Home Rule Act preserve the right of local self-government in many areas, but the operation of a gas system, or any other proprietary or private business, is not one of them. Section 18 of the Home Rule Act, 53 P.S. § 13133, enumerating limitations on home rule authority, provides in pertinent part:

> [N]o city shall engage in any proprietary or private business except as authorized by the General Assembly.

Identical constitutional and statutory arguments were raised on behalf of PGW in *Biester*. There, we held that the protections for local self-government do not insulate PGW from state action, because it is an enterprise within the statutory limitation. *Biester*, 431 A.2d at 1132–34. As we rejected the constitutional and statutory arguments in *Biester*, we reject them here. We conclude we are not required to depart from our construction of the Gas Choice Act to accommodate concerns for local self-government raised by one class of gas customer.

■ The City and PGW also argue that the limitation on home rule authority ap-

plies to gas supplied to inhabitants of the City, not to gas supplied by the City-owned gas system to the City itself. They contend local self-government remains protected for this one class of service. We reject this argument, because the limitation on home rule authority is based on the overall type of enterprise, not the identity of the consumer. The limitation applies to "any proprietary or private business, such as the operation of a gas system. . . ." *Id.* at 1133. It is of no consequence whether the gas is delivered to a court, school, hotel, office or store. As to all, the state retains the right to act. As to all, the same procedure for ratemaking applies under the statewide Gas Choice Act. Neither the Constitution nor the Home Rule Act compels a departure from this uniform ratemaking procedure.

## III.

Finally, the City and PGW contend that the PUC prevents realization of the entire rate increase by imputing a charge which will not be paid in the absence of City Council approval.

This argument assumes City Council approval remains a precondition to rate adjustments for the municipal service class. As discussed, City Council approval of municipal service rates is not required by the Gas Choice Act. Although the PUC must continue to utilize the same ratemaking methodology and requirements, there is no mandate that any body previously participating in ratemaking continue its involvement. Because the $22,558,000 increase was determined to be just and reasonable,

---

5. The so-called "Home Rule Amendment" to the Pennsylvania Constitution provides in part that:

> Municipalities shall have the right and power to frame and adopt home rule charters. . . . A municipality which has a home rule charter may exercise any power or

perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time.

PA. Const. of 1968, Art. IX, § 2.

6. Act of April 21, 1949, P.L. 655, *as amended*, 53 P.S. §§ 13101–13157.

PGW may charge it and collect it. There is no reason to assume that any portion of approved rate increase will not be realized.

For the foregoing reasons, we affirm the orders of the PUC.

### ORDER

AND NOW, this 13th day of August, 2003, the Order entered by the Pennsylvania Public Utility Commission on October 4, 2001, as modified by the Order of December 6, 2001, and the Order of February 21, 2002, which clarified the customer charge for the municipal service class, are **AFFIRMED.**