913 A.2d 825 (2007)
389 N.J. Super. 481
In the Matter of the OWNERSHIP OF RENEWABLE ENERGY CERTIFICATES ("RECs") Under the Electric Discount and Energy Competition Act, as it Pertains to Non-Utility Generators and the Board's Renewable Energy Portfolio Standards.
Superior Court of New Jersey, Appellate Division.
Argued December 5, 2006.
Decided January 10, 2007.
*826 Mark P. Asselta argued the cause for appellant Pollution Control Financing Authority of Camden County (Brown & Connery, attorneys; Mr. Asselta, of counsel; Mr. Asselta and Beth L. Marlin, Westmont, on the brief).
James H. Laskey, Bridgewater, argued the cause for appellants Wheelabrator Falls, Inc., and Wheelabrator Gloucester Company (Norris, McLaughlin & Marcus, *827 attorneys; Mr. Laskey, of counsel and on the brief).
Rogut McCarthy Troy, attorneys for appellant Covanta Energy Corporation (Daniel J. McCarthy, Cranford, on the brief).
Helene S. Wallenstein, Senior Deputy Attorney General, argued the cause for respondent Board of Public Utilities (Stuart Rabner, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Wallenstein and Anne Marie Shatto, Deputy Attorney General, on the brief).
Badrhn Ubushin argued the cause for respondent Department of the Public Advocate, Division of Ratepayer Advocate (Seema M. Singh, Rate Counsel, attorney; Ami Morita, Newark, and Diane Schulze, on the brief).
Julie L. Friedberg argued the cause for respondent Jersey Central Power & Light Company (Thelen Reid Brown Raysman & Steiner, attorneys; Ms. Friedberg and Marc B. Lasky, Florham Park, on the brief).
Gregory Eisenstark, Assistant Corporate Rate Counsel, argued the cause for respondent Public Service Electric & Gas Company.
Before Judges COBURN, AXELRAD and R.B. COLEMAN.
The opinion of the court was delivered by
COBURN, P.J.A.D.
These consolidated appeals challenge an April 20, 2005, final decision and order of the New Jersey Board of Public Utilities ("BPU"). At issue was ownership of a commodity created in this state for the electric power industry by the BPU: Renewable Energy Certificates ("RECs"). One Renewable Energy Certificate represents the environmental benefits or attributes of one megawatt-hour of generated renewable energy. In essence, renewable electric energy is energy derived, not from fossil fuels, but from, for example, the heat of the sun, or the movement of wind or water, or from the incineration of solid waste. Once issued, a Renewable Energy Certificate may be bought and sold in a public market or may be used by an electric utility to help satisfy its regulatory obligation to purchase increasing amounts of renewable energy each year.
The BPU decided to introduce the concept of Renewable Energy Certificates into New Jersey's electric power regulatory system to increase reliance on renewable energy in general, but its decision in this case was limited in scope: it only applies to ownership of these certificates for long-term contracts for the sale and purchase of renewable energy made before the BPU created the certificates in this state. Those contracts did not anticipate and consequently do not mention the certificates.
The BPU assigned initial ownership of the certificates in that limited contractual context to New Jersey's four electric utilities, the largest of which are respondents Jersey Central Power & Light Company and Public Service Electric & Gas Company. Each contract is between an electric utility as a renewable energy purchaser and a company that produces renewable energy. Wheelabrator Falls, Inc., and the other appellants are all renewable energy producers.
Most electricity in New Jersey is produced by companies other than appellants and is purchased by the utilities in annual auctions conducted pursuant to regulations issued by the BPU. The BPU's decision in this case does not control ownership of the certificates in that context.
*828 The issue of initial ownership of Renewable Energy Certificates for existing contracts that did not anticipate their creation has arisen in at least nine other states. Each state has ruled as the BPU did here; namely, that as applied to existing contracts for the sale of power to utilities by renewable energy producers, the certificates are the property of the purchasing utility rather than the producer. Edward A. Holt et al., Who Owns Renewable Energy Certificates? An Exploration of Policy Options and Practice, at xiv (Ernest Orlando Lawrence Berkeley National Laboratory 2006).[1]
Appellants claim ownership of the Renewable Energy Certificates and argue that the BPU's decision violates a federal statute, a state statute, and is arbitrary and capricious.
The Rate Counsel, Department of the Public Advocate, supports the BPU's decision as a fair resolution of the conflicting interests with the ultimate and just beneficiaries being the retail purchasers of electricity. We affirm.

I
In recent years, partially as a result of federal action, New Jersey, like other state governments, substantially altered the electric power industry by separating the production of electricity from its delivery at retail. The Legislature chose that course to reduce the cost of electricity and to increase the industry's use of renewable energy. The method chosen had two basic elements: creating a competitive market for the production of electricity and requiring the utilities to increase annually their purchases of renewable energy.
Before 1999, the electric utilities located in New Jersey were vertically-integrated monopolies, producing virtually all of the electricity they distributed, and charges for all services were "bundled" and billed at a single price. In re PSE&G Co.'s Rate Unbundling, Stranded Costs and Restructuring Filings, 330 N.J.Super. 65, 83, 748 A.2d 1161 (App.Div.2000), aff'd, 167 N.J. 377, 771 A.2d 1163 (2001), hereinafter referred to as "PSE&G."
Change began in 1978, when Congress enacted the Public Utility Regulatory Policies Act of 1978, Pub.L. No. 95-617, 92 Stat. 3117 (codified as amended in scattered sections of 16 U.S.C.A.) ("PURPA"), to increase competition in the production of electricity and reliance on renewable energy. FERC v. Mississippi, 456 U.S. 742, 745-46, 102 S.Ct. 2126, 72 L.Ed.2d 532, 538 (1982). To that end, regulations issued pursuant to PURPA require electric utilities to purchase energy offered by "Qualified Facilities." 18 C.F.R. § 292.303(a)(2006). Both cogeneration and small power production facilities are considered Qualified Facilities under PURPA. 16 U.S.C.A. § 796(17), (18). "A `cogeneration facility' is one that produces both electric energy and steam or some other form of useful energy, such as heat." FERC v. Mississippi, supra, 456 U.S. at 750, 102 S.Ct. at 2132, 72 L.Ed.2d at 541 n. 11 (citing 16 U.S.C.A. § 796(18)(A)). "A `small power production facility' is one that has a production capacity of no more than 80 megawatts and uses biomass, waste, or renewable resources (such as wind, water, or solar energy) to produce electric power." Ibid. (citing 16 U.S.C.A. § 796(17)(A)). Appellants are small power production facilities that process waste. Under PURPA, the rates for the electric power generated by the Qualified Facilities must be reasonable for the ultimate consumers, fair to the Qualified Facilities, but not in excess of what the utility's cost *829 would otherwise have been if it generated the power itself or purchased it from another source. 18 C.F.R. § 292.304(a) (2006).
Between 1986 and 1992, the BPU, in accordance with the PURPA mandate, approved the long-term contracts at issue. Although the contracts were not included in the record, we were advised at argument that they will expire in about nine years. In each instance, the purchaser is one of the four utilities and the seller is a non-utility generator or "NUG" that produces renewable energy. All of the appellants are NUGs that produce renewable energy.
These were not ordinary commercial agreements. The BPU's decision states that the rate of compensation it insisted on was higher than the market rate, "highly favorable to" these NUGs, and "took into account the environmental attributes of the power being sold. . . ." The decision also noted that these long-term contracts provided "greater revenues during the initial years" to enhance the ability of these NUGs to get financing.
In the period between 1985 and the late 1990s, "New Jersey consumers were paying about 50% above the national average for electricity." PSE&G, supra, 330 N.J.Super. at 84, 748 A.2d 1161. Although there were other causes, one factor was the "expensive power purchase agreements with the nonutility generators (NUGs)." Ibid.
In 1999, the Legislature enacted the Electric Discount and Energy Competition Act, N.J.S.A. 48:3-49 et seq. ("EDECA"), which established the framework for restructuring the electric power industry. The history leading up to enactment of this statute and a more detailed description of its provisions than is needed for this opinion is available in PSE&G, supra, 330 N.J.Super. at 84-90, 748 A.2d 1161.
The EDECA required the utilities to sell their power generation plants either to affiliates or entirely separate third parties and limited their function to the transmission and delivery of electricity at retail. Id. at 89-90, 748 A.2d 1161. Although customer billing would continue to be administered by the utilities, they had to "unbundle" their rates, separately identifying charges for generation, distribution, and transmission. Id. at 89, 748 A.2d 1161. And retail customers were to be given incentives to purchase renewable power. Id. at 89-90, 748 A.2d 1161.
One of the EDECA's critical provisions directed the BPU to adopt Renewable Portfolio Standards, which, in essence, required utilities to annually increase their reliance on renewable energy. N.J.S.A. 48:3-87(d). The Legislature also instructed the BPU to create a "renewable energy trading program" to help the industry satisfy the requirement for increased use of renewable electric power. N.J.S.A. 48:3-87(d)(2). The complex regulations implementing the statute are set forth in N.J.A.C. 14:8-1.1 to 14:8-2.12. Under those regulations, Renewable Energy Certificates can be used to assist in meeting the renewable energy requirements set forth in the Renewable Portfolio Standards. N.J.A.C. 14:8-2.8(a).
We were advised at argument that Renewable Energy Certificates are now being issued and traded in New Jersey. They have substantial value. For example, at argument one of the appellant's attorneys represented, without contradiction, that if the BPU had assigned the certificates to the Qualified Facilities, his company's annual income would increase by over $250,000.

II
Appellants argue that the BPU decision violates section 210(e) of PURPA, 16 *830 U.S.C.A. § 824a-3(e), by modifying their long-term contracts with the utilities. Respondents concede that the BPU may not modify contracts entered into pursuant to PURPA, as the court held in Freehold Cogeneration Associates v. Board of Regulatory Commissioners of the State of New Jersey, 44 F.3d 1178 (3d Cir.), cert. denied, 515 U.S. 815, 116 S.Ct. 68, 133 L.Ed.2d 29 (1995). But they assert that the Freehold case is distinguishable and that here no contract was modified. We agree with respondents on both counts.
In Freehold, which involved a long-term contract like those involved in this case, the BPU's predecessor directed the parties to re-negotiate a decrease in the charges allowed by the contract or to agree on a buy-out based on such a decrease. Id. at 1183. Plaintiff refused and sued in federal court, arguing that the state regulatory agency had exceeded its power. Ibid. As noted, the court agreed, holding that PURPA prevents a state from "reconsideration of its prior approval" of a power purchase agreement involving a Qualified Facility. Id. at 1192.
Appellants concede that the BPU's decision leaves untouched their income under the long-term contracts. Nonetheless, they claim that assignment of the certificates to the utilities is a contract modification because it adds value to the electric power the utilities are receiving. Of course, as respondents admit, the decision does increase the value of the electricity received by the utilities from appellants, but the increase results, not from modification of the contracts, but from a regulatory decision designed to meet the legislative goal of "reduc[ing] the aggregate energy rates currently paid by all New Jersey consumers." N.J.S.A. 48:3-50(c)(1).
The record fully substantiates the BPU's assertion, which appellants do not deny, that when it approved the contracts at issue, the BPU required the utilities to pay and allowed appellants to receive substantially more than the mere value of the electricity, and that it did so specifically because the electricity was produced with renewable resources. Even though the appellants may have believed their contracts were only about providing electricity, clearly the BPU approved the contracts for the specific purpose of encouraging alternative energy development from renewable resources. And, as the BPU concluded, assignment of the Renewable Energy Certificates to appellants necessarily would have meant that retail consumers would have had to pay more for electricity. This result would be unfair to retail consumers, who have already paid for appellants' electricity, and is entirely inconsistent with the governing state legislation.
Appellants also contend that the BPU's decision conflicts with a ruling issued by the agency charged with administering PURPA, the Federal Energy Regulatory Commission ("FERC"). But the FERC decision, In re American Ref-Fuel Co., 105 F.E.R.C. ¶ 61,004 (2003), reh'g denied, 107 F.E.R.C. ¶ 61,016 (2004), petition for review dismissed sub nom. Xcel Energy Services, Inc. v. FERC, 407 F.3d 1242, 1244 (D.C.Cir.2005), clearly supports the BPU by recognizing that Renewable Energy Certificates are state creations that exist entirely outside of PURPA. Thus, in paragraph 23 and 24 of its original decision, FERC concluded as follows:
23. [Renewable Energy Certificates] RECs are relatively recent creations of the States. Seven States have adopted Renewable Portfolio Standards that use unbundled RECs. What is relevant here is that the RECs are created by the States. They exist outside the confines of PURPA. PURPA thus does not address the ownership of RECs. And the contracts for sales of QF [Qualified Facilities] *831 capacity and energy, entered into pursuant to PURPA, likewise do not control the ownership of the RECs (absent an express provision in the contract). States, in creating RECS, have the power to determine who owns the REC in the initial instance, and how they may be sold or traded; it is not an issue controlled by PURPA.

[In re American Ref-Fuel Co., supra, 105 F.E.R.C. ¶ 61,004 (emphasis added).]
24. We thus grant Petitioners' petition for a declaratory order, to the extent that they ask the Commission to declare that contracts for the sale of QF capacity and energy entered into pursuant to PURPA do not convey RECs to the purchasing utility (absent an express provision in a contract to the contrary). While a state may decide that a sale of power at wholesale automatically transfers ownership of the state-created RECS, that requirement must find its authority in state law, not PURPA.
[Ibid. (emphasis added).]
Although the underlined language in paragraph 24 might be construed as helpful to appellants, the balance of that paragraph and the whole of paragraph 23 clearly support the BPU's decision. In short, according to FERC, states decide who owns the REC in the initial instance.
Appellants next argue that the BPU's decision violates PURPA by discriminating against renewable energy Qualified Facilities in favor of cogeneration Qualified Facilities. PURPA does provide that electricity purchases "shall not discriminate against qualifying cogenerators or qualifying small power producers." 16 U.S.C.A. § 824a-3(b)(2); see also 18 C.F.R. § 292.304(a)(1) (2006). A cogenerator produces both electricity and valuable thermal energy, and can sell both separately, but that was so before the creation of Renewable Energy Certificates. Furthermore, a cogenerator does not receive the certificates under the BPU's program. Thus, there is no basis for appellants' claim that the program discriminates against them in favor of the cogenerators. If the certificates had never been created, the same dichotomy would exist as between cogenerators and renewable energy producers; namely, cogenerators would have the advantage of obtaining additional income from their thermal energy. Therefore, the BPU was not arbitrary in failing to decide that its program discriminates against appellants.
We will touch briefly on the remaining arguments. Appellants contend that the BPU's decision violates the EDECA's direction that "[n]othing in this act shall be construed to alter [existing] non-utility generator power purchase contracts. . . ." N.J.S.A. 48:3-61(k). We reject that argument for the same reasons we rejected the similar argument under PURPA. Although we agree with appellants' argument respecting the legal effect of certain affidavits they submitted annually in relation to their long-term contracts, our agreement with their argument does not affect the result. The BPU viewed the affidavits as conceding that the renewable attributes of appellants' electricity belonged to the utilities. But the affidavits do not say that, which is hardly surprising since Renewable Energy Certificates did not then exist. Although the finding is unsupportable, we will not discuss the issue since the BPU's decision is adequately based on the other considerations discussed above and further detailed in the decision itself.
Finally, we reject as without sufficient merit to warrant discussion, R. 2:11-3(e)(1)(E), the argument of appellant Pollution Control Financing Authority of Camden County that the BPU's decision is unfair to it and to the taxpayers of New *832 Jersey because Pollution Control's tipping fees have dropped substantially as a result of the federal court's decision in Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders, 112 F.3d 652 (3d Cir.), cert. denied, 522 U.S. 966, 118 S.Ct. 412, 139 L.Ed.2d 316 (1997), amended by 135 F.3d 891 (3d Cir.1998).
"The Legislature has endowed the BPU with broad power to regulate public utilities . . . [and] considerable discretion in exercising those powers." In re Elizabethtown Water Co., 107 N.J. 440, 449, 527 A.2d 354 (1987). In reviewing the BPU's decision, our scope of review is quite limited, particularly in a case such as this where the judgment exercised by the agency relies heavily on the agency's expertise. In re PSE&G Co.'s Rate Unbundling, Stranded Cost and Restructuring Filings, 167 N.J. 377, 384, 771 A.2d 1163 (2001). The decision may "not be disturbed unless we find a lack of `reasonable support in the evidence.'" In re Jersey Cent. Power & Light Co., 85 N.J. 520, 527, 428 A.2d 498 (1981)(quoting In re New Jersey Power & Light Co., 9 N.J. 498, 509, 89 A.2d 26 (1952)). In this case, the BPU exercised its judgment after a thorough discussion of the evidence and with careful consideration of appellants' arguments. Since the BPU's decision violates neither federal nor state law and is not arbitrary or capricious, we are required to uphold it.
Affirmed.
NOTES
[1] This source is available at eetd.lbl.gov/ea/emp/reports/59965.pdf.