**ARIPPA, Petitioner**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 10, 2008.

Decided March 3, 2009.

**2.** 75 Pa.C.S. § 3804.

Michael L. Swindler, Harrisburg, for petitioner.

Lawrence F. Barth, Harrisburg, for respondent.

Steven C. Gray, Harrisburg, for intervenor, Office of Small Business Advocate.

Anthony D. Kanagy, Harrisburg, for intervenor, PPL Electric Utilities Corporation.

Alan Michael Seltzer, Wyomissing, for intervenors Metropolitan Edison Company and Pennsylvania Electric Company.

BEFORE: LEADBETTER, President Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge [1], COHN JUBELIRER, Judge, SIMPSON, Judge and LEAVITT, Judge.

OPINION BY President Judge LEADBETTER.

In this appeal, we are asked to determine which entity, the non-utility generation facility or the electric distribution company, owns alternative energy credits where the power purchase agreement executed by the two entities is silent on the issue. This occurred because the contract was entered into before the creation of alternative energy credits in 2005 by the Alternative Energy Portfolio Standards Act (AEPS).[2] After review, we affirm the

---

1. The decision in this case was reached before January 1, 2009, when Judge Friedman assumed the status of senior judge.

2. Act of November 30, 2004, P.L. 1672, *as amended*, 73 P.S. §§ 1648.1–1648.8.

Public Utility Commission's (Commission) order concluding that the electric distribution company owns the credits under these circumstances.

AEPS went into effect in 2005 and required, among other things, that a certain portion of the electricity that is sold to customers be generated from alternative energy sources.[3] Section 3(a)(1) of AEPS, 73 P.S. § 1648.3(a)(1). Pursuant to AEPS, the Commission created an alternative energy credits program. Section 3(e) of AEPS, 73 P.S. § 1648.3(e). An "alternative energy credit" is a tradable instrument "used to establish, verify and monitor compliance with the act." Section 2 of AEPS, 73 P.S. § 1648.2. A unit of credit equals "one megawatt hour of electricity from an alternative energy source." *Id.*

In order to comply with AEPS, an electric distribution company or electric generation supplier must "[purchase] sufficient alternative energy credits and [submit] documentation of compliance to the program administrator." Section 3(e)(4)(i) of AEPS, 73 P.S. § 1648.3(e)(4)(i). The alternative energy credits can be self-generated or purchased, either along with the electric commodity or separately through a tradable instrument. Section 3(e)(4)(ii) of AEPS, 73 P.S. § 1648.3(e)(4)(ii). As originally enacted, AEPS did not specify which

entity owned the credits. In 2007, however, the legislature amended AEPS to provide that the credits are owned by the generator. Sections 2 and 3(e)(12) of AEPS, amended by the Act of July 17, 2007, P.L. 114, 73 P.S. §§ 1648.2 and 1648.3(e)(12). That amendment is not applicable to the instant petition for review.

In 2005, Pennsylvania Electric Company (Penelec) and Metropolitan Edison Company (Met Ed), both electric distribution companies, sought a declaratory order from the Commission, determining that where a power purchase agreement was executed before the enactment of AEPS, the electric distribution company owned the alternative energy credits.[4] Various parties intervened, including ARIPPA.[5] The Administrative Law Judge (ALJ) determined that the credits produced by the non-utility generators were owned by the electric distribution companies since those companies owned the electricity once it was generated. The Commission denied the ensuing exceptions and adopted the ALJ's opinion and reasoning, noting, in pertinent part, as follows:

> The ALJ focused on the fact that the [alternative energy credits] were created to measure [the electric distribution company's] compliance with [AEPS]. Since the [electric distribution compa-

---

**3.** Alternative energy sources include, among other things, solar photovoltaic or other solar electric energy, solar thermal energy and wind power. *See* Section 2 of AEPS, 73 P.S. § 1648.2.

**4.** Apparently, Met Ed and York County were parties to a power purchase agreement, whereby Met Ed was required to purchase electricity generated by York County's power plant. According to the Commission's opinion, the underlying proceeding was initiated after York County informed Met Ed that it intended to sell the alternative energy credits associated with the electricity generated at its facility to an entity other than Met Ed.

**5.** ARIPPA is a non-profit entity whose members are non-utility generators that burn coal refuse for fuel, creating alternative energy power for sale to electric distribution companies, such as Penelec and Med Ed, pursuant to long-term power purchase agreements. Many of the power purchase agreements were entered into prior to the enactment of AEPS and the creation of alternative energy credits. Accordingly, the pre–2005 agreements do not mention or provide for alternative energy credits, even though a number of the agreements remain in effect today.

nies] were purchasing qualifying alternative generation under the [power purchase agreements], the ALJ determined that the [electric distribution companies] were also entitled to the [credits] as measurement of the power purchased. The ALJ expressed the concern that a contrary holding would force the [electric distribution companies] to purchase additional [credits] from other sources, or even pay a penalty, when "in fact, they had purchased and were using energy generated by the [non-utility generators] in actual compliance with [AEPS] but unable to prove it."

Commission's Opinion and Order at 6 (entered February 12, 2007) (citations to ALJ opinion omitted); R.R. at 1424a. Thereafter, ARIPPA filed a petition for review with this court.[6]

## I. Preccmption

ARIPPA argues that the Public Utility Regulatory Policies Act of 1978 (PURPA), Pub.L. No. 95–617, § 2, 92 Stat. 3119 (codified as amended in scattered sections of 15, 16, and 30 U.S.C.) precludes a state agency from modifying a power purchase agreement and, therefore, the Commission's order, which determines ownership of the credits, violates PURPA. While ARIPPA posits this argument as an issue of preemption,[7] other than noting

that PURPA precludes state reformation of power purchase agreements, it fails to cite to any authority or engage in any meaningful discussion of the manner in which the federal scheme specifically pervades or dominates the regulation of alternative energy credits. As we noted in *Wheeling & Lake Erie Railway Co. v. Pa. Pub. Util. Comm'n*, 778 A.2d 785 (Pa. Cmwlth.2001), a federal statute may be interpreted as preempting state powers "only if such result is the clear and manifest purpose of the Congress." *Id.* at 791. We may infer preemption in those cases:

(1) where the scheme of the federal regulation is so pervasive that the Congress left no room for the states to supplement it; (2) where the federal statute touches a field, in which the federal interest is so dominant that it must be assumed that the Congress intended to preclude enforcement of the state laws on the same subject; or (3) where the state law conflicts with the federal law, thereby rendering compliance with both federal and state laws an impossibility.

*Id.* Moreover, the United States Supreme Court has held that Congress has not preempted all state utility law by enacting PURPA. *Fed. Energy Regulatory Comm'n v. Mississippi*, 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). Wheth-

---

**6.** In addition to the arguments addressed below, ARIPPA summarily asserts that the Commission's decision violates Article I, Section 10 of the United States Constitution because it retroactively impairs contractual obligations under the PURPA. ARIPPA also asserts that the Commission's decision results in an unconstitutional taking in violation of the Fifth and Fourteenth amendments to the United States Constitution. However, other than footnoting to a federal decision in its summary of argument (a case which is clearly distinguishable), ARIPPA does not cite to any au-

thority, nor develop any legal argument, in support of these bald assertions. *See* ARIPPA's Brief at 12, 35. Accordingly, we will not give any consideration to these contentions.

**7.** Preemption is based on the Supremacy Clause of the United States Constitution, which provides: "This Constitution, and the Laws of the United States ... shall be the supreme Law of the Land...." U.S. Const. art. VI, cl. 2. The Supremacy Clause prevents states from enacting laws that are contrary to federal law. *Lower Merion Sch. Dist. v. Doe*, 593 Pa. 437, 931 A.2d 640 (2007).

er Congress has preempted the regulation and ownership of alternative energy credits is a question of law, subject to our plenary review. *See generally Clement & Muller, Inc. v. Tax Review Bd. of City of Phila.,* 659 A.2d 596 (Pa.Cmwlth.1995).

PURPA was enacted in late 1978 to address a nationwide energy crisis. *Fed. Energy Regulatory Comm'n v. Mississippi,* 456 U.S. at 745, 102 S.Ct. 2126. PURPA promotes the development of new generating facilities and the conservation of fossil fuels. *New York v. Fed. Energy Regulatory Comm'n,* 535 U.S. 1, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002). The Federal Energy Regulatory Commission (FERC) promulgated regulations under PURPA, providing states with leeway to implement PURPA. *Pa. Elec. Co. v. Pa. Pub. Util. Comm'n,* 544 Pa. 475, 677 A.2d 831 (1996). Accordingly, the Commission has implemented PURPA and associated FERC rules. *See* 52 Pa.Code §§ 57.31–57.39.

Here, the ALJ and the Commission both relied on *American Ref–Fuel Company,* 105 FERC ¶ 61,004 (2003), to support the conclusion that the issue of credit ownership is controlled by state law, rather than PURPA. In *American Ref–Fuel,* owners of waste-to-energy power plants sought a declaratory order that power purchase agreements entered into pursuant to PURPA do not convey renewable energy credits (similar to alternative energy credits) to utility companies absent an express contractual provision to that effect. In concluding that the contracts did not convey the credits absent an express contractual provision, FERC opined that renewable energy credits are created by the states; they "exist outside the confines of PURPA," and, therefore, PURPA does not

address ownership of the credits. *Id.* at ¶ 61,007. According to FERC, states have the authority to determine who owns the renewable energy credits. *Id.* Further, it concluded that, "[w]hile a state may decide that a sale of power at wholesale automatically transfers ownership of the state-created [renewable energy credits], that requirement must find its authority in state law, not PURPA." *Id.* at ¶ 61,007.[8]

Like the Commission, the United States Court of Appeals for the Second Circuit has also recognized that FERC has determined that state law governs the conveyance of alternative energy credits, and that Congress has not demonstrated an intent to regulate such credits under federal law. *See Wheelabrator Lisbon, Inc. v. Conn. Dep't of Pub. Util. Control,* 531 F.3d 183 (2d Cir.2008) (discussing *American Ref–Fuel* ) (*Wheelabrator I* ).

*Wheelabrator I* is analogous to the instant case. There, an energy generating facility and an electric distribution company entered into an agreement in 1991, prior to the creation of alternative energy credits. Following execution of the agreement, the energy credits became an independently tradable commodity, causing a dispute over ownership of the credits. The Connecticut Department of Public Utility Control (Department) determined that the electric distribution company owned the credits, and the state supreme court affirmed, concluding that the Department had jurisdiction to interpret the agreement and decide the issue. *See Wheelabrator Lisbon, Inc. v. Dep't of Pub. Util. Control (Wheelabrator II),* 283 Conn. 672, 931 A.2d 159 (2007).

---

8. Even the dissenting Commissioner in *American Ref–Fuel* opined that states created renewable energy credits and PURPA does not address who owns such credits. *American Ref–Fuel,* 105 FERC at ¶ 61,008 (Brownell, Commissioner dissenting). Commissioner Brownell would have dismissed the petition and left the appropriate state to determine who owned the renewable energy credits at issue. *Id.*

In a related proceeding filed in federal court, Wheelabrator Lisbon, a producer of renewable energy, sought a declaratory order that PURPA preempted the Department's decision. More specifically, Wheelabrator argued that the Department's decision modified the parties' agreement, thereby constituting "utility-type regulation" in violation of PURPA.[9] The Second Circuit Court of Appeals concluded that the Department's decision did not modify or require renegotiation of the contract in violation of PURPA; rather, the Court held that the Department had authority to interpret the parties' agreement and determine ownership of the credits. *Wheelabrator I*, 531 F.3d at 189. In addition, considering *American Ref–Fuel*, the Court further noted that rather than demonstrate an intent to control regulation of renewable energy credits, FERC has explicitly acknowledged that state law governs the conveyance of such credits. *Id.* at 189–90.

Similarly, in *In re Ownership of Renewable Energy Certificates*, 389 N.J.Super. 481, 913 A.2d 825 (2007), the New Jersey Superior Court, Appellate Division, addressed an analogous issue under New Jersey's alternative energy credit scheme. There, following *American Ref–Fuel*, the court determined that states have the authority to decide which entity owns the credits. *Id.* at 831.

Notwithstanding the above, ARIPPA relies on *Freehold Cogeneration Assocs., L.P. v. Bd. of Regulatory Comm'rs of State of New Jersey*, 44 F.3d 1178 (3d Cir.1995), to support its position that PURPA precludes the Commission from reopening pre-AEPS power purchase agreements and modifying the consideration therein to include the transfer of alternative energy credits. In *Freehold*, the decrease in the cost of obtaining electrical power rendered long term power supply contracts economically infeasible. As a result, the state agency directed the parties to a power purchase agreement to renegotiate the purchase rate term or negotiate a buy-out of the agreement. Freehold, a cogeneration facility, sought a declaratory judgment that the state agency's order was preempted by PURPA. The United States Court of Appeals for the Third Circuit concluded that the state agency's modification of the rates in the power purchase agreement constituted a utility-type modification of a contract that conflicted with and was preempted by Section 210(e) of PURPA, 16 U.S.C. § 824a–3(e). *See Freehold*, 44 F.3d at 1192.

As did the courts in *Wheelabrator I* and *In Re Ownership of Renewable Energy Certificates*, we conclude that *Freehold* is completely distinguishable; the ownership of alternative energy credits was not at issue in *Freehold*. Here, the Commission has not modified the terms of an existing and approved contract, but rather has determined ownership of assets which were not contemplated, let alone provided for in the contracts at issue.[10] Accordingly, *Freehold* does not support ARIPPA's argument that the Commission lacks authority to determine ownership of the alternative energy credits in the present circumstances. In *American Ref–Fuel*,

---

**9.** Specifically, Section 210(e) of PURPA, 16 U.S.C. § 824a–3(e).

**10.** ARIPPA concedes that alternative energy credits did not exist when PURPA was enacted and could not have been contemplated by PURPA. ARIPPA's Brief at 14. Further, ARIPPA admits that "[n]either PURPA nor the [power purchase agreements] thereunder provided for the sale of any [alternative energy credits], ... but rather dealt only with purchase of energy and/or capacity at avoided costs. Simply put, the [power purchase agreements] made no mention of [alternative energy credits]." *Id.*

FERC concluded that PURPA does not preempt state law concerning the ownership of alternative energy credits. Further, the courts in *Wheelabrator I* and *In re Ownership of Renewable Energy Certificates* agreed with that conclusion and determined that an interpretation of a power purchase agreement silent on the ownership of alternative energy credits did not violate PURPA. We agree with these analyses and, thus, conclude that PURPA did not preempt the Commission's authority to determine the ownership of the alternative energy credits at issue here.[11]

## II. Subject matter jurisdiction

ARIPPA next argues that the Commission did not have subject matter jurisdiction to determine ownership of the alternative energy credits, as this is a private contractual dispute.[12] The legislature imbues the Commission with authority in enabling statutes. *PECO Energy Co. v. Pa. Pub. Util. Comm'n*, 568 Pa. 39, 791 A.2d 1155 (2002). The statutory grant of power must be clear. If a statute's text does not provide the Commission with specific authority, a strong and necessary implication from such text may, nonetheless, provide such authority. *Id.* at 46, 791 A.2d at 1159.

AEPS provides that the Commission "shall establish an alternative energy credits program as needed to implement this act." Section 3(e)(1) of AEPS, 73 P.S. § 1648.3(e)(1). AEPS further provides:

(2) The commission shall approve an independent entity to serve as the alternative energy credits program administrator. The administrator shall have those powers and duties assigned by commission regulations. Such powers and duties shall include, but not be limited to, the following:

(i) To create and administer an alternative energy credits certification, tracking and reporting program. This program should include, at a minimum, a process for qualifying alternative energy systems and determining the manner credits can be created, accounted for, transferred and retired.

Sections 3(e)(2)-(2)(i) of AEPS, 73 P.S. § 1648.3(e)(2)-(2)(i). In addition, the Commission "will carry out the responsibilities delineated within this act." Section 7(a) of AEPS, 73 P.S. § 1648.7(a). These provisions manifest a broad grant of power to the Commission to regulate in the area of alternative energy credits.[13]

As noted above, in the original, 2005 version of AEPS, the legislature did not

---

**11.** Finally, as the Commission notes, if PURPA preempts state law, then AEPS in its entirety may be unconstitutional under the Supremacy Clause, and no alternative energy credits would exist in Pennsylvania. Commission's Brief at 17–18. We decline to adopt such a conclusion, especially since that issue is not before this Court.

**12.** The issue of subject matter jurisdiction is a question of law subject to our plenary review. *Commonwealth v. Jones*, 593 Pa. 295, 929 A.2d 205 (2007).

**13.** While not directly applicable, we also note that in order to adequately protect the public interest, the Commission has very broad pow-

ers in overseeing and, where not otherwise prohibited, even reforming public utility contracts. Specifically:

The commission shall have power and authority to vary, reform, or revise, upon a fair, reasonable, and equitable basis, any obligations, terms, or conditions of any contract heretofore or hereafter entered into between any public utility and any person, corporation, or municipal corporation, which embrace or concern a public right, benefit, privilege, duty, or franchise, or the grant thereof, or are otherwise affected or concerned with the public interest and the general well-being of this Commonwealth. Section 508 of the Public Utility Code, 66 Pa.C.S. § 508.

address ownership of alternative energy credits, but amended AEPS in 2007 to provide that alternative energy credits "shall remain the property of the alternative energy system [such as ARIPPA's members] until the alternative energy credit is voluntarily transferred by the alternative energy system." Section 2 of AEPS, 73 P.S. § 1648.2.[14] The amendment also provided that, "[n]otwithstanding the addition of section 3(e)(12) [73 P.S. § 1648.3(e)(12)] of the act, nothing in this act is intended to reverse or modify [the Commission's] order [in the instant case]." Section 3.1 of the Act of July 17, 2007, P.L. 114, No. 35. *See* Historical and Statutory Notes to Section 3 of AEPS, 73 P.S. § 1648.3. While we do not necessarily read the latter provision as having any effect on the substantive merits of the Commission's order, we do infer from it a recognition by the General Assembly of the Commission's jurisdiction to act in this matter. This is of critical significance, since the Commission's authority must derive from legislative grant.

In addition, in *Wheelabrator II*, the Connecticut Supreme Court determined that the Connecticut Department of Public Utility Control had subject matter jurisdiction over the dispute described in *Wheelabrator I*. While the statutory scheme concerning the Connecticut Department's authority is not exactly the same as the Commission's authority under AEPS, *Wheelabrator II* is persuasive authority for our conclusion that a state utility agency has subject matter jurisdiction to determine the ownership of alternative energy

credits in an agreement executed before such credits existed.

The nature of alternative energy credits is distinct from items normally bargained for in a private contract. The credits are a recent creation of the legislature, and as indicated above, the Commission must at least provide the "process for qualifying alternative energy systems and determining the manner credits can be created, accounted for, transferred and retired." Section 3(e)(2)(i) of AEPS, 73 P.S. § 1648.3(e)(2)(i). Finally, although alternative energy credits may be bought and sold, their precise nature as a property right has not been developed and settled in the law. Considering the unique nature of alternative energy credits and the provision in AEPS for the Commission's extensive oversight of them, we believe, like the court in *Wheelabrator II*, that resolving this dispute is not a matter of ordinary contract interpretation, but rather a process that implicates the particular expertise of the Commission. Accordingly, we hold that the Commission had jurisdiction over this action.

### III. Ownership of the alternative energy credits

 ARIPPA next argues that if this Court determines that the Commission had subject matter jurisdiction, then the Commission erred in determining that the electric distribution companies own the alternative energy credits. ARIPPA contends that the Commission committed an error of law as the credits are separate commodities that were not conveyed or paid for under the power purchase agree-

---

14. The amendment further provided that:
 Unless a contractual provision explicitly assigns alternative energy credits in a different manner, the owner of the alternative energy system or a customer-generator owns any and all alternative energy credits associated with or created by the produc-

tion of electric energy by such facility or customer, and the owner or customer shall be entitled to sell, transfer or take any other action to which a legal owner of property is entitled to take with respect to the credits. Section 3(e)(12) of AEPS, 73 P.S. § 1648.3(e)(12).

ments. ARIPPA also argues that separating credits from the energy generated is in accordance with the policy of AEPS and intended to provide incentives for generators to build more renewable energy capacity.

In response, the Commission argues that if electric distribution companies do not own the credits, then they essentially would have to pay twice in order to comply with AEPS, even though by having purchased alternative energy from ARIPPA they have fulfilled the purpose of AEPS. Further, the Commission contends that since the original version of AEPS is silent as to ownership of the credits, its interpretation is reasonable.

Intervenors and an *amici* have presented arguments as well. Those supporting the Commission have argued that since the electric distribution companies own the energy or megawatt hours of electricity under the power purchase agreements, they also own the credits. In addition, they argue that if non-utility generators own the credits, then ratepayers essentially would pay twice for the same energy. An *amici* supporting ARIPPA contends that energy is not transferred to electric distribution companies until it is delivered at a metering point; thus, generators own the credits.

The Commission's decision must be in accordance with applicable law. *See* Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704. Whether the Commission committed an error of law in interpreting the statutory provisions of AEPS is subject to our plenary review. *See Chester Water Auth. v. Pa. Pub. Util. Comm'n*, 581 Pa. 640, 868 A.2d 384 (2005). We also recognize that the Commission's interpretation of a utility law is given great deference. *City of Phila. v. Pa. Pub. Util. Comm'n*, 829 A.2d 1241 (Pa. Cmwlth.2003). However, there is no con-

trolling statutory or case law to inform this decision. ARIPPA, the Commission, intervenors, and *amici* have all presented persuasive arguments as to why electric distribution companies or non-utility generators should own the credits. Whether non-utility generators or electric distribution companies are determined to own the credits, the victorious entity will gain a windfall, as the credits are tradable instruments with economic value that were not bargained for in the pre-AEPS power purchase agreements.

In reaching our determination, we first note a number of persuasive decisions from other courts which have reached the same conclusion as did the Commission in the instant case. In 2007, the New Jersey Superior Court, Appellate Division, noted that nine other states have ruled that the purchasing utility, not the energy producer, owned the alternative energy type credits. *In re Ownership of Renewable Energy Certificates*, 913 A.2d at 828. Accordingly, that court affirmed the decision of the New Jersey Board of Public Utilities that determined that the purchasing utility, not the energy producer, owned the credits. *Id.* at 832. Moreover, as discussed above, *Wheelabrator II* affirmed a decision that concluded that electric distribution companies owned credits similar to those at issue here.

ARIPPA points to decisions from California and Texas that held that energy producers, not utility companies, owned the alternative energy credits. *See Re Renewables Portfolio Standard Program*, Rulemaking Proceeding 04–04–026, Decision 05–05–011 (Cal.P.U.C. May 5, 2005); *Petition of Sw. Pub. Serv. Co. for Declaratory Order Interpreting Comm'n Subst. R. § 25.173 Implementing Pub. Util. Regulatory Act § 39.904*, No. 29815 (Tex. P.U.C. March 16, 2005); However, as the Commission noted, these cases are distin-

guishable because California's decision did not discuss energy generating facilities subject to PURPA, and Texas's regulatory scheme is distinct from that found in AEPS. Commission's Opinion and Order at 17–18; R.R. at 1435a–36a; ALJ's Decision and Order at 35–37 (entered July 5, 2006); R.R. at 1395a–97a. Even if those cases were not distinguishable, multiple states have reached the same conclusion as our Commission.

As the Commission points out, the purpose of AEPS is to encourage the creation and use of energy from alternative sources, and the fact that the credits are a tradable commodity is a secondary effect of the statutory scheme to effectuate that goal. Where, as here, the distribution company has already purchased energy from an alternative energy supplier (albeit under a pre–2005 agreement that made no provision for alternative energy credits), the underlying purpose of AEPS has been satisfied. Nonetheless, if the credits attributable to that power belong to the generating company, the distribution company will have to purchase credits separately and pass that additional charge along to the consuming public.[15] Thus, the Commission concluded that the public interest favored awarding ownership rights in the credits to the distribution company. Moreover, the contracts themselves are entirely silent on the issue of these rights, and any attempt to determine the parties' intent or how they might have structured the contract if they had anticipated the future creation of saleable credits is speculative at best. Thus, as there is no controlling statutory language in the applicable version of AEPS, no con-

trolling precedent, and no guiding language in the contracts themselves, this court accepts the Commission's persuasive interpretation and reasoning in concluding that electric distribution companies own the credits under the circumstances presented here.

Accordingly, we affirm the Commission's order.

### ORDER

AND NOW, this 3rd day of March, 2009, the order of the Pennsylvania Public Utility Commission in the above captioned matter is hereby AFFIRMED.

DISSENTING OPINION BY Judge PELLEGRINI.

Because I would hold that the Public Utility Commission (Commission) does not have jurisdiction to determine who "owns" alternative energy credits, I respectfully dissent.

In 1978, Congress enacted the Public Utility Regulatory Policies Act of 1978 (PURPA), codified and relevant to this case at 16 U.S.C. §§ 796(17)-(22) and 16 U.S.C. § 824a–3. PURPA required that regulated electric utilities offer to purchase electric energy from alternative power sources in the form of cogeneration and small power production facilities. To purchase PURPA power, regulated utilities entered into purchase power agreements with those alternative suppliers— non-utility generators, either on their own or at the Commission's direction.

In 2004, the General Assembly passed the Alternative Energy Portfolio Stan-

---

**15.** The Commission also noted that if credits were unavailable for purchase, then electric distribution companies could face a penalty for not complying with AEPS even though they essentially had already complied with AEPS by purchasing the energy from the non-

utility generators in the power purchase agreements. As the Commission and the ALJ concluded, it is unlikely that the legislature would intend such a result. Commission's Opinion and Order at 16; R.R. at 1434a.

dards Act (AEPSA),[1] which required increasing percentages of electricity to be sold from designated energy sources. 73 P.S. §§ 1648.1–1648.8. Instead of selling customers the required percentage of electricity from those sources, Section 3 of AEPSA, 73 P.S. § 1648.3, gave the regulated utility the option to purchase alternative energy credits.[2] Because the credits had a value independent from the electricity that was created by the alternative energy source, AEPSA created a derivative that could be bought and sold. Because one of PURPA's stated purposes was the promotion of energy conservation and it encouraged the development of alternate energy sources, the electricity involved in the PURPA purchase power agreements at issue in this case appeared to qualify as "alternative energy sources" that, correspondingly, created an "alternative energy credit."

The ultimate question involved in this appeal is who owns the alternative energy credits under the PURPA purchase power agreements—the regulated utilities or the non-utility generators. The majority affirms the Commission's decision that the regulated utilities, not the non-utility generators, own the credits. Because I would vacate the Commission's decision, as it does not have jurisdiction under AEPSA to decide that issue, I respectfully dissent.

The Commission contends that it has been given jurisdiction on the issue of who owns the credits under the purchase power agreements pursuant to the italicized language in 73 P.S. § 1648.3(e). That provision provides:

(e) Alternative energy credits.—

(1) The commission shall establish an alternative energy credits program as needed to implement this act. The provision of services pursuant to this section shall be exempt from the competitive procurement procedures of 62 Pa. C.S. (relating to procurement).

(2) The commission shall approve an independent entity to serve as the alternative energy credits program administrator. The administrator shall have those powers and duties assigned by commission regulations. Such powers and duties shall include, but not be limited to, the following:

(i) To create and administer an alternative energy credits certification, tracking and reporting program. This program should include, at a minimum, a process for qualifying alternative energy systems *and determining the manner credits can be created, accounted for, transferred and retired.*

(ii) To submit reports to the commission at such times and in such manner as the commission shall direct.

(3) All qualifying alternative energy systems must include a qualifying meter to record the cumulative electric production to verify the advanced energy credit value. Qualifying meters will be approved by the commission as defined in paragraph (4).

(4) (i) An electric distribution company or electric generation supplier shall comply with the applicable requirements of this section by purchasing sufficient

1. Act of November 30, 2004, P.L. 1672; 73 P.S. §§ 1648.1–1648.8.

2. " 'Alternative energy credit.' A tradable instrument that is used to establish, verify and monitor compliance with this act. A unit of credit shall equal one megawatt hour of elec-

tricity from an alternative energy source. The alternative energy credit shall remain the property of the alternative energy system until the alternative energy credit is voluntarily transferred by the alternative energy system." 73 P.S. § 1648.2.

alternative energy credits and submitting documentation of compliance to the program administrator.

(ii) For purposes of this subsection, one alternative energy credit shall represent one megawatt hour of qualified alternative electric generation, whether self-generated, purchased along with the electric commodity or separately through a tradable instrument and otherwise meeting the requirements of commission regulations and the program administrator. (Emphasis added.)

Nothing in the italicized language gives the Commission the authority to determine who owns an alternative energy credit under a purchase power agreement. All that it authorizes the Commission to do is to determine how the credits are created, how they are tracked and how they are retired.

Because the Commission has not been given jurisdiction to hear who owns the alternative energy credits, I would hold that who owns the alternative energy credits is a matter of contract law required to be heard in courts of common pleas. Accordingly, I respectfully dissent.

Judge SMITH–RIBNER joins in this dissenting opinion.