■ DKRW WIND HOLDINGS, LLC, Appellant, v TRANSCANADA ENERGY, LTD., Respondent. [61 NYS3d 228]—

Order, Supreme Court, New York County (O. Peter Sherwood, J.), entered March 7, 2016, which, insofar as appealed from as limited by the briefs, denied plaintiff's motion for summary judgment on its first through fourth causes of action, and granted defendant's motion for summary judgment dismissing those causes of action, unanimously modified, on the law, to deny defendant's motion as to the first and third causes of action, and otherwise affirmed, without costs.

This breach of contract action arises from a "Project Fee Agreement" (the PFA) by which plaintiff transferred to defendant its interest in developing a wind energy facility located near Kibby Mountain in Maine (the Kibby Project) in exchange for certain payments, including an annual "Operating Fee." Plaintiff claims that defendant breached the PFA by improperly calculating two components of the fee—"gross electricity sales revenue" and "Royalty Rate."

Plaintiff argues that defendant wrongfully failed to include in "gross electricity sales revenue" revenue from sales of environmental attributes associated with the energy generated by the Kibby Project that are known as renewable energy credits (RECs). We find that the PFA is ambiguous as to the meaning of the term "gross electricity sales revenue" and that the extrinsic evidence submitted by the parties to prove their intent is inconclusive (see *Hartford Acc. & Indem. Co. v Wesolowski*, 33 NY2d 169, 172 [1973]; *Dorel Steel Erection Corp. v Seaboard Sur. Co.*, 291 AD2d 309 [1st Dept 2002]).

Plaintiff emphasizes that the PFA does not expressly exclude REC revenue from "gross electricity sales revenue." Defendant counters that it does not expressly include REC revenue either. However, the question is what someone in the renewable energy industry would generally understand the term "gross electricity sales revenue," standing alone, to include, and the answer to that question is not clear as a matter of law from the face of the PFA.

The PFA provides that it is to be interpreted in accordance with New York law. Nevertheless, because the underlying transactions involved energy that was produced and consumed outside of New York, New York's regulatory scheme governing energy produced or consumed in New York—which, at the time the parties contracted, apparently did not provide for trading in RECs "unbundled" from the associated electricity—is not relevant to determining whether the term "gross electricity sales revenue," as used in the PFA, includes REC revenue. Notwithstanding the PFA's New York choice-of-law clause, New York's regulatory scheme for energy sales within New York, as it existed at the time of contracting, has no bearing on how the parties intended to divide between themselves the revenue from out-of-state energy sales that were not governed by the New York regulatory scheme.

We also reject plaintiff's alternative argument that Maine law, at the time the parties contracted, required that the PFA be construed to include the associated RECs. Plaintiff relies on a Notice of Investigation issued by the Maine Public Utilities Commission that concluded that certain power purchase agreements should be construed as including both electricity and RECs unless otherwise specified. However, this conclusion was admittedly "tentative[ ]" and, at any rate, applied only to contracts that, unlike the PFA, were subject to the federal Public Utility Regulatory Policies Act (16 USC § 2601 *et seq.*) and predated implementation of New England's system for trading unbundled RECs. Because unbundled sales were not yet pos-

sible, these contracts had no reason to make any provision for them. It is undisputed that by the time the PFA was executed unbundling was commonplace. The other cases cited by plaintiff are distinguishable on this same ground (*see Wheelabrator Lisbon, Inc. v Connecticut Dept. of Pub. Util. Control*, 531 F3d 183, 186-187 [2d Cir 2008]; *ARIPPA v Pennsylvania Pub. Util. Commn.*, 966 A2d 1204, 1206, 1212-1214 [Pa Commw Ct 2009]; *In re Ownership of Renewable Energy Certificates*, 389 NJ Super 481, 484-485, 913 A2d 825, 826-828 [2007]).

The parties' experts offer conflicting opinions as to whether the "industry standard" was to assume RECs were included unless specifically excluded or vice versa. The fact that defendant specifically excluded RECs in a later series of agreements is immaterial, since these are just one example, and this example cannot shed light on what the expectation would be where, as here, RECs are not mentioned at all.

Most persuasive is the change in terminology from "gross revenues" in a prior agreement between the parties to "gross electricity sales revenue" in the PFA. However, while the addition of the words "electricity sales" suggests an intention to limit the revenue that would otherwise be included, the precise nature of the limitation is ambiguous. While defendant's representative testified that his intention in adding these words was to exclude RECs, the words can also reasonably be read as plaintiff suggests—to exclude revenue from sources other than energy sales, for example, tax credits, capacity sales, and equipment sales.

Plaintiff separately argues that defendant wrongfully used a turbine not envisioned by the parties during contract negotiation, thereby substantially reducing the "Capacity Factor," a component of the Royalty Rate. However, the PFA indisputably did not contain a requirement that any particular turbine be used, and plaintiff cannot now read such a requirement into it.

We have considered plaintiff's remaining arguments and find them unavailing. Concur—Friedman, J.P., Manzanet-Daniels, Kapnick, Kern and Singh, JJ.