# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Blue Pilot Energy, LLC,  :
                Petitioner  :
                           :
        v.                 :    No. 1054 C.D. 2019
                           :    Argued:  May 13, 2020
Pennsylvania Public Utility  :
Commission,                :
                Respondent  :

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
          HONORABLE RENÉE COHN JUBELIRER, Judge
          HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE ELLEN CEISLER, Judge
          HONORABLE J. ANDREW CROMPTON, Judge

**OPINION BY JUDGE BROBSON**          **FILED:  October 27, 2020**

Blue Pilot Energy, LLC (Blue Pilot), an electric generation supplier (EGS),[1] has invoked this Court's appellate jurisdiction, asking that we reverse the July 19, 2018 and July 11, 2019 Orders of the Pennsylvania Public Utility Commission (PUC).  Blue Pilot contends that the PUC exceeded its statutory

---

[1] Under the Electricity Generation Customer Choice and Competition Act (Competition Act), 66 Pa. C.S. §§ 2801-2815, an EGS may sell electricity directly to customers and use the transmission and distribution facilities of an electric distribution company (EDC) to deliver the electricity to the customer.  While EDCs are regulated public utilities, EGSs are generally not considered public utilities.  *See HIKO Energy, LLC v. Pa. Pub. Util. Comm'n*, 163 A.3d 1079, 1082 n.1 (Pa. Cmwlth. 2017) (en banc), *aff'd*, 209 A.3d 246 (Pa. 2019) (*HIKO I*).  They are expressly excluded from the definition of "public utility" in the Public Utility Code "except for limited purposes as described in sections 2809 (relating to requirements for electric generation suppliers) and 2810 (relating to revenue neutral reconciliation)."  66 Pa. C.S. § 102 (definition of "public utility").

authority by engaging in contract interpretation and granting across-the-board refund relief to all Blue Pilot customers. Blue Pilot also challenges the $1,066,900 civil penalty that the PUC imposed as unconstitutionally excessive in violation of the Excessive Fines Clauses of the Pennsylvania Constitution and the Eighth Amendment to the United States Constitution.[2] Upon review, and for the reasons set forth below, we conclude that the PUC acted within its jurisdiction in adjudicating the matter before it. We reject Blue Pilot's constitutional challenge to the civil penalty in this case. We find merit, however, to Blue Pilot's challenge to the refund remedy fashioned by the PUC and, therefore, reverse that aspect of the PUC's Orders.

## I. BACKGROUND[3]

The PUC licensed Blue Pilot as an EGS in Pennsylvania on June 10, 2011, to supply electricity to consumers within the service territories of all EDCs operating in Pennsylvania. Blue Pilot began its advertising and marketing efforts directed toward Pennsylvania retail customers in 2012. Blue Pilot offered only variable rate plans. Generally, these plans included an enticing fixed introductory rate that converted to a variable rate at the conclusion of the introductory period, typically 60 to 90 days. The variable rate could change on a month-to-month basis. Blue Pilot ceased marketing activity in Pennsylvania in March 2014. The PUC suspended Blue Pilot's license on March 14, 2016.

---

[2] Article I, Section 13 of the Pennsylvania Constitution provides: "Excessive bail shall not be required, *nor excessive fines imposed*, nor cruel punishments inflicted." (Emphasis added.) Similarly, the Eighth Amendment, made applicable to the states by the Fourteenth Amendment to the United States Constitution, provides: "Excessive bail shall not be required, *nor excessive fines imposed*, nor cruel and unusual punishments inflicted." (Emphasis added.)

[3] Unless otherwise noted, relevant factual background is derived from the July 7, 2016 Initial Decision (Initial Decision) of the Administrative Law Judges (ALJs) in this matter. The Initial Decision includes factual findings, none of which Blue Pilot disputes on appeal.

This matter relates to the sharp increase in the price/cost of electricity that Blue Pilot and other EGSs charged retail Pennsylvania customers under variable pricing arrangements during a period of sustained cold weather in early 2014 referred to as the "Polar Vortex of 2014."[4] Blue Pilot's disclosure statement to its customers purported to link its variable rate determinations to wholesale electric prices within the PJM Interconnection LLC (PJM) service area[5]:

> You have a variable rate plan with a starting price set at **RATE** cents per kWh. This initial rate will be effective for at least the first ninety (90) days of service. Thereafter, your price may vary on a month-to-month basis. This price includes Transmission Charges, but excludes applicable state and local Sales Taxes and the Distribution Charges from your local EDC. At any time after ninety (90) days of service, but not more frequently than monthly, *Blue Pilot may increase or decrease your rate based on several factors, including changes in wholesale energy market prices in the PJM Markets. Your variable rate will be based upon PJM wholesale market conditions*. Please log on to www.bluepilotenergy.com or call Customer Service at 877-513-0246 for additional information and updates.

(Reproduced Record (R.R.) at 21a (emphasis added).) The Polar Vortex of 2014 caused higher-than-normal wholesale electricity prices in a large portion of PJM's service area, including Pennsylvania. As noted above, retail variable rates also sharply increased during this time. The sharp increase in retail prices under variable rate arrangements prompted many consumers to file complaints with the Pennsylvania Office of Attorney General (OAG) and the Pennsylvania Office of

---

[4] *See HIKO I*, 163 A.3d at 1083-84.

[5] As we noted in *HIKO I*: "PJM . . . is a regional transmission organization that coordinates the movement of wholesale electricity in 13 states (including Pennsylvania) and the District of Columbia." *Id.* at 1083 n.3.

3

Consumer Advocate (OCA), alleging that Blue Pilot and other EGSs were overcharging their customers.

The OAG and the OCA jointly commenced proceedings before the PUC against Blue Pilot by filing a Formal Complaint on June 20, 2014.[6] The Formal Complaint, in five separate counts, contended that (1) Blue Pilot failed to provide accurate pricing information to its customers, (2) Blue Pilot's pricing did not conform to its disclosure statement, (3) Blue Pilot made misleading and deceptive promises of savings to its customers, (4) Blue Pilot lacked good faith in handling customer complaints, and (5) Blue Pilot violated the Telemarketer Registration Act.[7] Generally speaking, the Formal Complaint targeted alleged improper conduct by Blue Pilot in its marketing practices, its handling of consumer complaints, and its adherence to the terms of its disclosure statement to its customers.

After the parties developed a record through administrative proceedings before the ALJs, the ALJs issued their Initial Decision on July 7, 2016, concluding that Blue Pilot failed to comply with several PUC regulations. With respect to the first count, the ALJs concluded that Blue Pilot failed to comply with 52 Pa. Code §§ 54.5(c)(3)(i)-(ii) (requiring that disclosure statements for variable pricing include "[c]onditions of variability" and "[l]imits on price variability"), 54.43(1) (requiring EGSs to use "plain language and common terms in communications with consumers"), 54.43(f) (holding EGSs responsible for fraudulent, deceptive, and other unlawful marketing practices), and 111.12(d)(2) (prohibiting false or

___

[6] 52 Pa. Code § 5.21(a) ("A person complaining of an act done or omitted to be done by a person subject to the jurisdiction of the [PUC], in violation, or claimed violation of a statute which the [PUC] has jurisdiction to administer, or of a regulation or order of the [PUC], may file a formal complaint with the [PUC].").

[7] Act of December 4, 1996, P.L. 911, *as amended*, 73 P.S. §§ 2241-2249.

misleading representations of rates or savings). With respect to the second count of the Formal Complaint, the ALJs concluded that Blue Pilot "charged its customer[s] prices that did not conform to its disclosure statement in violation of 52 Pa. Code §§ 54.4(a) and 54.5(a)."[8] (R.R. at 160a.) The ALJs also concluded that the violations of the foregoing regulations supported the charges set forth in the third count of the Formal Complaint.

With respect to the alleged mishandling of consumer complaints during the Polar Vortex of 2014, the fourth count of the Formal Complaint, the ALJs determined that Blue Pilot failed to act with good faith, honesty, and fair dealing, as required by 52 Pa. Code § 56.1(a) and the terms of Blue Pilot's license. The ALJs further concluded that Blue Pilot failed to adhere to the dispute resolution procedures set forth in the PUC's regulations, made applicable to Blue Pilot under the terms of its license, specifically 52 Pa. Code §§ 56.141(1) (requiring adherence to dispute resolution procedures in regulation); 56.151 (requiring, *inter alia*, investigation of customer complaints and report to customer within 30 days), and 56.152 (setting forth required contents of report to customer). Finally, on the fifth count, the ALJs concluded that Blue Pilot violated the Telemarketer Registration Act by failing to provide customers with a written contract and failing to obtain customer signatures agreeing to enrollment. (R.R. at 161a-62a.)

In terms of remedy, the ALJs, *inter alia*, assessed a civil penalty against Blue Pilot of $2,554,000. The ALJs further ordered Blue Pilot to deposit $2,508,449 into a "refund pool," $100,000 of which would be used to compensate a third-party

---

[8] Section 54.4(a) provides: "EGS prices billed must reflect the marketed prices and the agreed upon prices in the disclosure statement." 52 Pa. Code § 54.4(a). Conversely, Section 54.5(a) provides: "The agreed upon prices in the disclosure statement must reflect the marketed prices and the billed prices." *Id.* § 54.5(a).

administrator (TPA) chosen by the OAG and the OCA. The ALJs directed the TPA to use the refund pool "to provide at least 2,516 consumers refunds of all charges that were over and above the Price to Compare of their respective [EDCs'] service territories for amounts charged from December 2013 through March 2014."[9] (R.R. at 163a.) The ALJs ordered the TPA to use "best efforts to distribute the funds from the refund pool within 180 days" of receipt from Blue Pilot and to provide monthly reports to the OCA, the OAG, Blue Pilot, and designated PUC staff. (*Id.*) Any undistributed funds were to be forwarded to the Pennsylvania Treasury as unclaimed property. The ALJs also permanently revoked Blue Pilot's license.

The parties filed exceptions to the Initial Decision. In its July 19, 2018 Opinion and Order (Merits Order), the PUC largely overruled the exceptions. Relevantly, the PUC sustained Blue Pilot's challenge only to the amount of the civil penalty and, instead, assessed a reduced civil penalty of $1,066,900. Blue Pilot filed a Petition for Reconsideration, which the PUC denied in its July 11, 2019 Opinion and Order (Reconsideration Order). In this appeal, Blue Pilot does not challenge the PUC's evaluation of the evidence, its fact finding, or its legal conclusions. Instead, Blue Pilot purports only to challenge the relief imposed by the PUC, specifically the creation of the "refund pool" and the amount of the civil penalty.[10]

---

[9] The Price to Compare, or PTC, is the amount, or rate, that an EDC charges a retail customer who has not selected an EGS for electric generation supply—a/k/a default service. *See* 52 Pa. Code § 54.182.

[10] "Appellate review of a PUC order is limited to determining whether a constitutional violation, an error of law, or a violation of PUC procedure has occurred and whether necessary findings of fact are supported by substantial evidence." *Popowsky v. Pa. Pub. Util. Comm'n*, 910 A.2d 38, 48 (Pa. 2006). To the extent any of the statutes or regulations that bear on the issues raised on appeal are ambiguous, we will afford the appropriate level of deference to the PUC's interpretation. *See Crown Castle NG E. LLC v. Pa. Pub. Util. Comm'n*, 234 A.3d 665, 674-80 (Pa. 2020).

## II.  DISCUSSION

### A.  Power/Authority of PUC

The first two issues on appeal relate to the power and/or authority of the PUC. First, Blue Pilot contends that the PUC acted beyond its authority when it determined that Blue Pilot had failed to adhere to the terms of its disclosure statement. According to Blue Pilot, the PUC essentially determined that Blue Pilot breached its contracts with its customers.  Citing the Pennsylvania Superior Court decision in *Allport Water Authority v. Winburne Water Company*, 393 A.2d 673 (Pa. Super. 1978) (en banc), Blue Pilot contends that the PUC lacks jurisdiction to rule on private party contract disputes.  Rather, the courts are the proper avenue to resolve private party contract disputes.[11]

In response, the PUC contends it appropriately adjudicated the charge in the Formal Complaint that Blue Pilot violated PUC regulations in failing to charge its customers consistent with the terms of its disclosure statement.  The PUC points specifically to its resolution of Count II, wherein the PUC, adopting the fact finding and reasoning of the ALJs, concluded that Blue Pilot violated 52 Pa. Code §§ 54.4(a) and 54.5(a), in billing customers prices that failed to conform with the terms of the disclosure statement.  Specifically, although the disclosure statement provided that the variable rate "will be based upon PJM wholesale market conditions," the PUC found, based on credited testimony, that Blue Pilot's prices ran counter to the PJM wholesale recorded prices.  In the PUC's assessment, this was a clear violation of the PUC's regulations governing EGSs.  *See* 66 Pa. C.S. § 2809(b) (providing that applicant for EGS license must be "willing and able to . . . conform to the . . . lawful

---

[11] The issue of subject matter jurisdiction is a question of law subject to our plenary review. *Mazur v. Trinity Area Sch. Dist.,* 961 A.2d 96, 101 (Pa. 2008).

orders and regulations of the [PUC] . . . , including the [PUC's] regulations regarding standards and billing practices"). The OAG and the OCA make similar arguments.

In reply, Blue Pilot presses its contention that the PUC inappropriately engaged in contract interpretation, noting that the disclosure statement is a contract between an EGS and its customer. Blue Pilot acknowledges the PUC regulations that require EGS prices to reflect the agreed upon prices set forth in the disclosure statement. It contends, however, that the PUC's authority to enforce those regulations ends where the violation can be discerned *without* interpreting language in the statement. As an example, Blue Pilot concedes that where a disclosure statement provides a firm rate of 10 cents per kWh, the PUC could determine whether the EGS violated the disclosure statement by simply comparing the quoted price to the charged price. In that case, Blue Pilot posits, the PUC would not be interpreting the language of a contract. Here, by contrast, Blue Pilot's disclosure statement did not disclose a specific variable rate. Accordingly, a "simple comparison" was not possible. The PUC had to consider, instead, expert testimony to determine whether Blue Pilot violated the terms of the disclosure statement. This, according to Blue Pilot, crossed the line into contract interpretation and the jurisdictions of the courts.

With respect to the PUC's authority, this Court has acknowledged: "The legislature imbues the [PUC] with authority in enabling statutes. The statutory grant of power must be clear. If a statute's text does not provide the [PUC] with specific authority, a strong and necessary implication from such text may, nonetheless, provide such authority." *ARIPPA v. Pa. Pub. Util. Comm'n*, 966 A.2d 1204, 1211 (Pa. Cmwlth. 2009) (en banc) (citations omitted). *ARIPPA* involved a dispute over the ownership of alternative energy credits based on power purchase agreements

8

between EGSs and EDCs in effect prior to the passage of the Alternative Energy Portfolio Standards Act (AEPS).[12]  Two EDCs filed for declaratory relief from the PUC, asking that the PUC declare that those credits belong to the EDCs.  The PUC ultimately ruled in favor of the EDCs and granted the requested declaratory relief.

ARIPPA, a nonprofit entity representing EGSs, appealed to this Court, raising, *inter alia*, the subject matter jurisdiction of the PUC to determine the ownership question, which ARIPPA viewed as a private contractual dispute. Acknowledging the directive and authority that the General Assembly conveyed to the PUC to establish and implement the alternative energy credit program, we concluded that the AEPS conferred broad power on the PUC "to regulate in the area of alternative energy credits."  *ARIPPA*, 966 A.2d at 1211.  In addition, we noted how "[t]he nature of alternative energy credits is distinct from items normally bargained for in a private contract."  *Id.* at 1212.  We explained:

> The credits are a recent creation of the legislature, and as indicated above, the [PUC] must at least provide the "process for qualifying alternative energy systems and determining the manner credits can be created, accounted for, transferred and retired."  Section 3(e)(2)(i) of AEPS, 73 P.S. § 1648.3(e)(2)(i).  Finally, although alternative energy credits may be bought and sold, their precise nature as a property right has not been developed and settled in the law.  Considering the unique nature of alternative energy credits and the provision in AEPS for the [PUC's] extensive oversight of them, we believe . . . that resolving this dispute is not a matter of ordinary contract interpretation, but rather a process that implicates the

---

[12] Act of November 30, 2004, P.L. 1672, *as amended*, 73 P.S. §§ 1648.1-.8.  The AEPS required, *inter alia*, "that a certain portion of the electricity that is sold to customers be generated from alternative energy sources."  *ARIPPA*, 966 A.2d at 1207.  To monitor compliance with the mandate, the PUC created an alternative energy credit program, through which credits could be purchased or traded by EDCs and EGSs.

> particular expertise of the [PUC]. Accordingly, we hold
> that the [PUC] had jurisdiction over this action.

*Id.*

Applying our holding and rationale in *ARIPPA* here, we first note that the Competition Act requires all EGSs wishing to do business in the Commonwealth to be licensed by the PUC. 66 Pa. C.S. § 2809(a). The Competition Act further requires all licensed EGSs to abide by the PUC's regulations. *Id.* § 2809(b). Blue Pilot does not challenge the validity of the PUC's regulations that require EGSs to bill in accordance with the terms of their disclosure statements. 52 Pa. Code §§ 54.4(a), 54.5(a). The PUC possesses the statutory authority to enforce its regulations. 66 Pa. C.S. § 502. Like alternative energy credits, then, electric generation service "is distinct from items normally bargained for in a private contract." *ARIPPA*, 966 A.2d at 1212. The ability of customers to shop for electric generation service is a result of legislative action, the Competition Act, which created a regulated marketplace under which EGSs may offer their services to consumers provided they follow certain rules. Whether an EGS breaks the rules of that marketplace by violating a regulation of the PUC "is not a matter of ordinary contract interpretation." *Id.* Enforcement of those rules falls squarely within the jurisdiction of the PUC. *See HIKO I*, 163 A.3d at 1100 (reaching same conclusion).

Our sister court's decision in *Allport Water Authority*, which predates *ARIPPA* by three decades, is not to the contrary. In that case, a local water authority and its customers initiated an action in common pleas court for breach of contract, complaining that the water utility from which they purchased their water supply failed to provide "adequate service" to meet customer demands. The utility filed preliminary objections, arguing that jurisdiction over the adequacy of service

10

belonged in the PUC and not the court of common pleas. The common pleas court overruled the jurisdiction objection.

On appeal, the utility argued that the complaint's challenge, though sounding in contract, was in essence a challenge to the adequacy of the water service the utility provided to the local authority and its customers, a question within the jurisdiction of the PUC. *See Allport Water Auth.*, 393 A.2d at 675-76.[13] The Superior Court agreed:

> It is apparent to us that [the utility's] contractually adopted obligation to "render reasonably adequate service" merely echoes its legally imposed obligation as set forth by the Public Utility Law. A basic question still remains: What exactly is reasonably adequate water service under the circumstances? Although [the local authority and its customers] would have us hold otherwise, the instant case does not simply involve a breach of contract. Rather, [the] complaint raises questions which, as established by a long line of Pennsylvania appellate decisions, should be decided in the first instance by the PUC.

*Id.* at 676. Finding that the dispute belonged in the PUC and not the common pleas court, the Superior Court reversed.

---

[13] At the time, Section 401 of the Public Utility Law provided, in relevant part:

> Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons . . . and the public. Such service also shall be reasonably continuous and without unreasonable interruptions or delay. Such service and facilities shall be in conformity with the regulations and orders of the commission.

Act of May 28, 1937, P.L. 1053, *as amended*, *formerly* 66 P.S. § 1171, repealed by the Act of July 1, 1978, P.L. 598. Today, this mandate is found in Section 1501 of the Public Utility Code, 66 Pa. C.S. § 1501.

As was the case in *Allport Water Authority*, and for the reasons explained above, this case does not simply involve a breach of contract. While the PUC has no obvious authority to vindicate private contractual rights in this area, it has unquestionable authority to ensure that Blue Pilot meets its obligation to comply with PUC regulations. That the two may be interrelated does not diminish the PUC's jurisdiction to enforce its own regulations through the formal complaint procedures in its regulations.

Next, we examine Blue Pilot's claim that the PUC exceeded its authority by creating a customer refund pool, to be administered by a TPA chosen by the OAG and the OCA. The PUC, adopting the ALJs' factual findings, concluded that Blue Pilot averaged approximately 2,516 customers during the period December 2013 through March 2014. The PUC further concluded that during this same period of time, Blue Pilot "overbilled" its customers 7,861 times. The PUC further determined that every instance where a customer was billed a rate in excess of the PTC was an event of "overbilling."[14] Although the PUC calculated the total overpayment amount during the period in question at approximately $2,459,517, it directed that Blue Pilot refund its customers a lesser amount requested by the OAG/OCA,

_____

[14] Perhaps the PUC chose the PTC as the base price against which to measure overbilling because it either could not calculate, due to the deficiencies in Blue Pilot's disclosure statement, what Blue Pilot's customers should have paid Blue Pilot during the Polar Vortex of 2014 or it assumed that all customers would have chosen default service had they not contracted with Blue Pilot. Either way, there is nothing in the Public Utility Code that requires an EGS to charge its customers a rate *less than or equal to* the PTC. To the contrary, the PUC has opposed placing such an artificial cap on EGS prices. In *Coalition for Affordable Utility Services and Energy Efficiency in Pennsylvania v. Pennsylvania Public Utility Commission*, 120 A.3d 1087 (Pa. Cmwlth. 2015) (en banc) (*CAUSE-Pa.*), an EDC asked the PUC to impose a price ceiling on EGSs as part of the EDC's Customer Assistance Program (CAP), which would have required any EGS wishing to provide energy to a CAP customer to charge a rate at or below the EDC's PTC. The PUC rejected the condition, concluding, *inter alia*, that such a cap was anti-competitive and unwarranted. We upheld the PUC's position on appeal. *CAUSE-Pa.*, 120 A.3d at 1106-07.

12

$2,408,499. It tacked on a $100,000 fee for a TPA, to be chosen by the OAG/OCA, who would administer the refund pool.

As to its authority in this regard, the PUC, in its Merits Order, explained the basis for its refund award:

> Upon review, we conclude that we have the authority to order across-the-board relief to all affected customers pursuant to our plenary authority under Section 501 of the [Public Utility] Code, 66 Pa. C.S. § 501. [The PUC] has, on numerous occasions, stated that it may require EGSs to provide refunds to retail customers in appropriate circumstances. These circumstances include, *inter alia*, when an EGS has billed customers in violation of the [PUC's] Chapter 54 marketing and billing Regulations.

(R.R. at 263a (citation omitted).) The PUC cites prior administrative decisions of the agency in support, but no judicial precedent on the authority question.

On appeal, Blue Pilot contends, as it did below, that the PUC lacks legislative authority to order Blue Pilot to issue refunds to its customers. Blue Pilot contends that the Public Utility Code contains only one provision that authorizes the PUC to direct a refund. Section 1312 of the Public Utility Code, titled "Refunds," provides, in relevant part:

> If, in any proceeding involving rates, the [PUC] shall determine that any rate received by a public utility was unjust or unreasonable, or was in violation of any regulation or order of the [PUC], or was in excess of the applicable rate contained in an existing and effective tariff of such public utility, the [PUC] shall have the power and authority to make an order requiring the public utility to refund the amount of any excess paid by any patron, in consequence of such unlawful collection . . . . Any order of the [PUC] awarding a refund shall be made for and on behalf of all patrons subject to the same rate of the public utility.

66 Pa. C.S. § 1312(a). By its express terms, this section only applies to public utilities, such as EDCs, and not EGSs. Blue Pilot further contends that as the PUC

13

lacks the authority to regulate the prices that EGSs charge their customers, it lacks the authority to direct refunds.

In addition, Blue Pilot directs the Court to Section 3301 of the Public Utility Code, 66 Pa. C.S. § 3301, which expressly provides that the PUC may impose a $1,000 civil penalty payable to the Commonwealth where a regulated entity, such as an EGS, violates the PUC's regulations.[15] The provision does not authorize other monetary relief—*i.e.*, damages or refunds. In addition to imposing a civil penalty, Blue Pilot notes that the General Assembly authorized the PUC to suspend or revoke an EGS's license in certain circumstances. 66 Pa. C.S. § 2809(c). But, again, there are no express provisions in the Public Utility Code that would authorize the PUC to order an EGS to pay damages to customers in the form of refunds. Given the foregoing, Blue Pilot contends that the General Assembly could have amended the

---

[15] Section 3301(a) of the Public Utility Code provides:

> If any public utility, or any other person or corporation subject to this part, shall violate any of the provisions of this part, or shall do any matter or thing herein prohibited; or shall fail, omit, neglect, or refuse to perform any duty enjoined upon it by this part; or shall fail, omit, neglect or refuse to obey, observe, and comply with any regulation or final direction, requirement, determination or order made by the [PUC], or any order of the [PUC] prescribing temporary rates in any rate proceeding, or to comply with any final judgment, order or decree made by any court, such public utility, person or corporation for such violation, omission, failure, neglect, or refusal, shall forfeit and pay to the Commonwealth a sum not exceeding $1,000, to be recovered by an action of assumpsit instituted in the name of the Commonwealth. In construing and enforcing the provisions of this section, the violation, omission, failure, neglect, or refusal of any officer, agent, or employee acting for, or employed by, any such public utility, person or corporation shall, in every case be deemed to be the violation, omission, failure, neglect, or refusal of such public utility, person or corporation.

66 Pa. C.S. § 3301(a).

Public Utility Code to expand the refund authority given to the PUC to include EGSs or it could have included such authority in the Competition Act itself. The General Assembly, however, did neither, evidencing a lack of intent to grant such authority to the PUC in these circumstances.

Blue Pilot also argues against any claim that the Public Utility Code imbues the PUC with the implicit authority to direct refunds to customers. Blue Pilot counters the PUC's claim that it has the authority to direct refunds in this matter under its "plenary authority" to regulate public utilities and enforce the Public Utility Code found in Section 501 of the Public Utility Code.[16] Blue Pilot first contends that EGSs do not fall within Section 501 because they are not public utilities. Even

[16] Section 501 of the Public Utility Code provides:

> (a) Enforcement of provisions of part.--In addition to any powers expressly enumerated in this part, the [PUC] shall have full power and authority, and it shall be its duty to enforce, execute and carry out, by its regulations, orders, or otherwise, all and singular, the provisions of this part, and the full intent thereof; and shall have the power to rescind or modify any such regulations or orders. The express enumeration of the powers of the [PUC] in this part shall not exclude any power which the [PUC] would otherwise have under any of the provisions of this part.

> (b) Administrative authority and regulations.--The [PUC] shall have general administrative power and authority to supervise and regulate all public utilities doing business within this Commonwealth. The [PUC] may make such regulations, not inconsistent with law, as may be necessary or proper in the exercise of its powers or for the performance of its duties.

> (c) Compliance.--Every public utility, its officers, agents, and employees, and every other person or corporation subject to the provisions of this part, affected by or subject to any regulations or orders of the [PUC] or of any court, made, issued, or entered under the provisions of this part, shall observe, obey, and comply with such regulations or orders, and the terms and conditions thereof.

66 Pa. C.S. § 501.

15

if it was applicable to EGSs, however, Blue Pilot maintains that the PUC would still need to justify, by a strong and necessary implication from the words of the statute, the need for refund authority. Looking to Section 2809(e) of the Competition Act, 66 Pa. C.S. § 2809(e),[17] which the PUC cited in its Merits Order, Blue Pilot observes that the section provides for the regulation of electric service by EGSs, not rates. Therefore, no refund authority could arise by necessary implication from that provision.

In response, the PUC tacitly concedes that there is no express authority in the Public Utility Code generally, or the Competition Act specifically, that authorizes the PUC to order the refund remedy in this case. Moreover, the PUC expressly concedes that it lacks "the authority to order across-the-board relief to all affected customers pursuant to its plenary authority under Section 501 of the [Public Utility] Code." (PUC Br. at 38.) The PUC, however, relies on prior administrative decisions for the proposition that it has required, and thus can require, EGSs to provide refunds to retail customers under particular circumstances—*e.g.*, "when an EGS has billed customers in violation of the [PUC's] Chapter 54 marketing and billing [r]egulations." (*Id.* at 39.) Specifically, the PUC relies heavily on its

---

[17] Section 2809(e) of the Competition Act provides:

> The [PUC] may forbear from applying requirements of this part which it determines are unnecessary due to competition among electric generation suppliers. In regulating the service of electric generation suppliers, the [PUC] shall impose requirements necessary to ensure that the present quality of service provided by electric utilities does not deteriorate, including assuring that adequate reserve margins of electric supply are maintained and assuring that 52 Pa. Code Ch. 56 (relating to standards and billing practices for residential utility service) are maintained.

66 Pa. C.S. § 2809(e).

16

December 18, 2014 Opinion and Order in *Commonwealth v. IDT Energy, Inc.*, (Pa. PUC, Docket No. C-2014-2427657, filed December 18, 2014) (IDT Opinion).

The IDT Opinion, *inter alia*, addresses specifically the question of whether the PUC has the authority under Section 1312 of the Public Utility Code to order EGSs to issue refunds—a/k/a "billing adjustments"—to customers. The PUC definitively concluded that it lacked the authority to order EGSs to provide refunds to customers under that section because "EGSs are not 'public utilities' under the [Public Utility] Code except for . . . limited purposes" not applicable to the matter. IDT Opinion at 16. The PUC noted, however, that nothing in the Public Utility Code precludes an EGS from agreeing to issue refunds as part of a settlement of a PUC proceeding. The PUC also noted that it had additional express authority to require a refund where a customer's supply has been switched to an EGS without the customer's complaint—*i.e.*, "slamming."[18]

Notwithstanding the foregoing, the PUC claimed "plenary authority under Section 501 . . . to direct an EGS to issue a credit or refund for an over bill." IDT Opinion at 17. The PUC explained:

> Under Section 501 [of the Public Utility Code] and related case law, the [PUC] has broad authority to enforce the

_____

[18] 52 Pa. Code § 57.177(b) provides:

> When the customer's dispute has been filed within the first two billing periods since the customer should reasonably have known of a change of the EGS and the dispute investigation establishes that the change occurred without the customer's consent, the customer is not responsible for EGS bills rendered during that period. *If the customer has made payments during this period, the company responsible for initiating the change of supplier shall issue a complete refund within 30 days of the close of the dispute.* The refund or credit provision applies only to the generation charges.

(Emphasis added.)

17

provisions of the [Public Utility] Code, including the [Competition Act], and is vested with broad powers to protect the rights of the public. These powers have been interpreted broadly to include both the express powers conferred by the [Public Utility] Code and those implied *powers necessarily implicit in the [Public Utility] Code*.

Directing a billing adjustment for an EGS over bill of supply charges is within the [PUC's] Section 501 powers to carry out the consumer protections in the . . . Competition Act that are applicable to competitive electricity generation supply service. These consumer protections include the Section 2809(b) requirement that EGSs comply with the [PUC's] Regulations, including the Chapter 54 billing and disclosure regulations. Having the authority to order EGS credits and/or refunds *carries out these statutorily[ ]prescribed consumer protections* by ensuring that electric generation supply bills are adjusted accordingly when an EGS, for example, fails to bill a customer in accordance with its disclosure statement, in violation of the [PUC's] Chapter 54 Regulations and, in turn, [Public Utility] Code Section 2809(b). Thus, *having the authority* to order EGS billing adjustments, including refunds, under the appropriate circumstances, *helps* ensure that EGSs comply with the [PUC's] Regulations and bill customers in accordance with their disclosure statement— a fundamental consumer protection under the . . . Competition Act.

Based on the foregoing, ordering EGS billing adjustments for an over bill of supply charges is *fully consistent* with the policy objectives of the . . . Competition Act as well. Under Section 2802(9) of the [Public Utility] Code, 66 Pa. C.S. § 2802(9), electric service, including electric supply, is to be available to customers on reasonable terms and conditions. The ability to order an EGS to provide a refund to a customer that has been over charged in violation of its [d]isclosure [s]tatement that has been required pursuant to the [Public Utility] Code and/or the [PUC's] Regulations *furthers this policy objective* by ensuring that customers receive accurate bills and hence, receive service under reasonable terms and conditions.

*Id.* at 17-18 (emphasis added) (footnotes omitted) (citations omitted). The OAG and the OCA similarly rely on the IDT Opinion to support the PUC's claimed authority to order refunds in this matter.

All parties agree that there is no express grant in the Public Utility Code generally and the Competition Act specifically of authority to the PUC to order across-the-board refund relief to all of Blue Pilot's customers as a remedy for Blue Pilot's adjudicated violation of the PUC's regulations relating to EGS disclosure statements. The only way, then, the PUC can exercise this authority is if the authority is grounded in "a strong and necessary implication from" the statutory text. *ARIPPA*, 966 A.2d at 1211. Stated another way, "the power of administrative agencies includes *such powers as are implied necessarily*." *Dep't of Envtl. Res. v. Butler Cty. Mushroom Farm*, 454 A.2d 1, 6 (Pa. 1982) (emphasis added). This relaxation of the general rule requiring express legislative delegation grew out of a recognition that legislatures cannot foresee every problem incidental to an agency's effort to implement a statutory scheme. *Office of Open Records v. Center Twp.*, 95 A.3d 354, 369 (Pa. Cmwlth. 2014) (en banc) (*Center Twp.*); *Sewer Auth. of Scranton v. Pa. Infrastructure Inv. Auth.*, 81 A.3d 1031, 1039 (Pa. Cmwlth. 2013). The requisite necessity must derive from the agency's express statutory duties and responsibilities and bear directly on the agency's ability to carry out those duties and responsibilities. *See Dep't of Transp. v. Beam*, 788 A.2d 357, 360 (Pa. 2002) ("[T]he rule requiring express legislative delegation is tempered by the recognition that an administrative agency is invested with the implied authority necessary to the effectuation of its express mandates.").

For example, in *Center Township*, we considered the question of whether the Office of Open Records (OOR) possessed the statutory authority to conduct *in*

19

*camera* review to determine whether an asserted privilege attached to disputed documents. The local agency that asserted the privilege argued that there is no provision in the Right-to-Know Law (RTKL)[19] that explicitly grants to the OOR or its appeals officers the authority to conduct *in camera* review. We agreed. We nonetheless concluded that such authority arises by necessary implication, because the RTKL expressly authorizes OOR appeals officers to conduct hearings, rule on procedural matters, and issue final determinations, even in cases involving allegedly privileged documents. *Center Twp.*, 95 A.3d at 368-70; Section 1102(a), (b) of the RTKL, 65 P.S. § 67.1102(a), (b). In terms of the necessity of *in camera* review, we opined:

> The propriety of *in camera* review is well-accepted *and it is oftentimes necessary* for a fact-finder to utilize this tool in order to determine whether a claimed privilege is applicable. And, in some instances, *in camera* review may be the only way that an appeals officer can assess, in a meaningful fashion, whether an agency has met its burden of proving that a document is privileged by a preponderance of the evidence. Indeed, in this case, the [t]ownship refused to provide even a privilege log when requested to do so by the OOR.

*Center Twp.*, 95 A.3d at 370 (emphasis added). In short, we held that the authority to conduct *in camera* review derived by necessity from the appeals officer's duty to adjudicate issues of privilege.

By contrast, in *Aetna Casualty and Surety Company v. Insurance Department*, 638 A.2d 194 (Pa. 1994), the Pennsylvania Insurance Department (Department) claimed broad power, as part of its statutory authority to issue market conduct reports, to order an insurance company to cease and desist from activities that, though not prohibited by Pennsylvania law, the Department determines as part of its

---

[19] Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-.3104.

20

market conduct examination to be adverse to the interests of policyholders. While this Court agreed with the Department's position on its implicit authority, the Pennsylvania Supreme Court reversed:

> The . . . Department argues that it would be anomalous to construe [the market conduct statute] so that the Insurance Commissioner could not order an insurance company to cease and desist from practices found to be inequitable because the overall purpose of the [statute] is to assure protection of policyholders through the examination process. *This argument incorrectly presumes that the examination and reporting process contemplated in [the statute] is inadequate to protect policyholders.* The carefully crafted legislative scheme brings four powerful forces to bear on the insurance industry in the conduct of its business affairs: (1) the scrutiny of the Insurance Commissioner; (2) the administrative hearing process; (3) the availability of the report for public inspection; and (4) the potential for newspaper publication of the report. We reject the notion that insurance companies will be unresponsive to these forces.

*Aetna*, 638 A.2d at 201 (emphasis added).

There is no dispute that Section 501(a) of the Public Utility Code grants general authority to the PUC "to enforce, execute and carry out, by its regulations, orders, or otherwise, all and singular, the provisions" of the Public Utility Code "and the full intent thereof." Moreover, Section 501(b) of the Public Utility Code vests within the PUC the "general administrative power and authority to supervise and regulate all public utilities doing business within this Commonwealth," and for purposes of Sections 2809 and 2810 of the Competition Act, EGSs are public utilities. Section 2809(b) of the Competition Act requires EGSs to comply with the PUC's regulations. Section 2809(e) of the Competition Act commands the PUC "to impose requirements [on EGSs] necessary to ensure that the present quality of service provided by electric utilities does not deteriorate." None of these sections,

however, expressly empower the PUC to order an EGS, which is found to be in violation of PUC regulations, to fund a refund pool for customers as a penalty for that violation.

The PUC, the OAG, and the OCA argue that such authority must be found from the above express statutory provisions. We are unpersuaded. Absent from any of their briefs in this matter is any argument that such refund authority is *necessary* to carry out the PUC's statutory duties under the Public Utility Code. Looking at the IDT Opinion, on which the PUC principally relies, we see only the PUC's view that a refund remedy "carries out . . . statutorily[ ]prescribed consumer protections," "helps" to ensure compliance with the PUC's regulations, and is "consistent with" and "furthers" the policy objectives of the Public Utility Code. IDT Opinion at 17-18. All of this may very well be true, but it does not establish the requisite necessity to relax the general rule that limits an agency's authority to only that which is expressly conferred by the General Assembly.

Critically, in making this argument, the PUC, the OAG, and the OCA offer no reason upon which we could conclude that the violation and penalty provisions found within Chapter 33 of the Public Utility Code and the license suspension and revocation authority found in the PUC regulations[20] are inadequate to protect the public and ensure EGS compliance with the PUC's regulations. In this case, the PUC relied on its express authority in Section 3301 to assess a civil penalty of over $1 million on account of Blue Pilot's violation of the PUC's regulations governing EGSs. Neither the PUC, the OAG, nor the OCA explains how the power to levy such a civil penalty, alone or in concert with the authority to suspend or revoke a license, is inadequate to protect consumers or curb misconduct by EGSs. In addition

---

[20] *See* 52 Pa. Code § 54.42.

to the authority to assess a civil penalty and to suspend or revoke an EGS license, Section 3302 of the Public Utility Code, 66 Pa. C.S. § 3302, imposes criminal penalties on EGSs that "knowingly fail, omit, neglect or refuse to obey, observe, and comply with any regulation" of the PUC.

Chapter 33 of the Public Utility Code also speaks directly to the issue of damages to consumers *in addition to* civil penalties assessed by the PUC under Section 3301:

> (a) General rule.--If any person or corporation shall do or cause to be done any act, matter, or thing prohibited or declared to be unlawful by this part, or shall refuse, neglect, or omit to do any act, matter, or thing enjoined or required to be done by this part, *such person or corporation shall be liable to the person or corporation injured thereby in the full amount of damages sustained in consequence thereof.* The liability of public utilities, contract carriers by motor vehicles, and brokers for negligence, as heretofore established by statute or by common law, shall not be held or construed to be altered or repealed by any of the provisions of this part.
>
> (b) Rights of Commonwealth unaffected.--The recovery in this section authorized shall in no manner affect a recovery by the Commonwealth of the penalty prescribed in section 3301 (relating to civil penalties for violations) for such violations of this part.

66 Pa. C.S. § 3309 (emphasis added). This section preserves a private right of action to pursue damages in the appropriate court of law, perhaps even premised upon a PUC administrative determination that a public utility or EGS acted contrary to PUC regulations.[21]  Again, neither the PUC, the OAG, nor the OCA claims that this express provision, and the related civil remedies available to consumers, whether at

---

[21] *See, e.g.*, *Pettko v. Pa. Am. Water Co.*, 39 A.3d 473 (Pa. Cmwlth. 2012) (holding that while PUC has primary jurisdiction to determine whether public utility violated statutes and regulations and to afford relief authorized by statute, common pleas court also has jurisdiction to grant relief PUC lacks power to award).

common law or by statute,[22] are inadequate to make consumers whole and discourage misconduct by EGSs, such that we must imply refund authority by necessity.

Section 1312 of the Public Utility Code also counsels against implying refund authority in this case. The PUC, the OAG, and the OCA concede, as they must, that Section 1312 of the Public Utility Code expressly grants the PUC the authority to direct the type of refund relief the PUC imposed in this case, but only with respect to public utilities and their patrons. They concede that this section does not apply to EGSs. Yet, they ask this Court to imply by necessity the very authority to order that which the PUC cannot order under the express refund authority conferred by the General Assembly. This is the exact opposite of implying authority necessary to carry out the General Assembly's intent. To do what the PUC, the OAG, and the OCA ask in this case would require us to confer on the PUC authority that the General Assembly withheld.[23] Doing so would run counter to our duty under Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1921(a), to ascertain and give effect to the intent of the General Assembly. In this regard, we are admonished to listen attentively to both what a statute says and what it does not say. *See Kmonk-Sullivan v. State Farm Mut. Auto. Ins. Co.*, 788 A.2d 955, 962 (Pa. 2001). Here, we would have to be deaf to both in order to affirm the portion of the PUC's Orders establishing a refund pool for Blue Pilot's customers.

---

[22] *See, e.g.*, Unfair Trade Practices and Consumer Protection Law, Act of December 17, 1968, P.L. 1224, *as amended*, 73 P.S. §§ 201-1 to -9.3.

[23] The General Assembly enacted the Competition Act in 1996, amending Title 66 of the Pennsylvania Consolidated Statutes to include Chapter 28—the Competition Act. Section 1312 of the Public Utility Code predates the Competition Act by almost two decades. Although the General Assembly chose to amend the definition of "public utility" in Section 102 of the Public Utility Code to account for the passage of the Competition Act, it did not amend Section 1312 of the Public Utility Code.

For all of these reasons, we conclude that the PUC acted within its jurisdiction in adjudicating the Formal Complaint's allegations that Blue Pilot violated applicable PUC regulations governing Blue Pilot's pricing and disclosure statement. Nonetheless, we will reverse the portion of the PUC's Orders that establish a refund pool for Blue Pilot's customers, as the PUC lacks the requisite express authority or necessary implied authority to grant that relief.[24]

## B. Amount of Civil Penalty

Although the PUC sustained Blue Pilot's excessive fines challenge to the ALJs' recommended civil penalty, Blue Pilot argues on appeal that the reduced $1,066,900 civil penalty that the PUC imposed in this case is still unconstitutionally excessive. Specifically, Blue Pilot argues that the civil penalty in this case is grossly disproportionate to the civil penalties paid by other EGSs that engaged in similar pricing misconduct during the Polar Vortex of 2014. Blue Pilot directs us to three such instances: (1) a $25,000 civil penalty paid by Energy Services Providers, Inc., d/b/a Pennsylvania Gas & Electric (PG&E); (2) a $25,000 civil penalty paid by IDT Energy, Inc. (IDT); and (3) a $125,000 civil penalty paid by Respond Power LLC (Respond Power). Blue Pilot contends that the civil penalty violated Blue Pilot's due process rights, in that it is disproportionate to the offense and unreasonable. Blue Pilot also alleges that the PUC "failed to adequately address" Blue Pilot's procedural due process challenge to the alleged failure by the OAG and the OCA to disclose the evidence or rationale for the civil penalty at the hearing, waiting, instead, to propose an amount during post-hearing briefing.

---

[24] In light of this decision, we do not address Blue Pilot's contention that the PUC exceeded its authority by treating the Formal Complaint as a class action lawsuit on behalf of all of Blue Pilot's customers.

25

Blue Pilot also argues that, in assessing the civil penalty in this case, the PUC failed to consider Blue Pilot's ability to pay, noting that Blue Pilot has not been actively involved in the Pennsylvania retail market since 2014. Finally, Blue Pilot argues that the civil penalty is linked to the PUC's decision to afford across-the-board refund relief as a matter of contract damages to all of Blue Pilot's customers.

The PUC responds that in assessing the appropriate civil penalty in this matter, it considered the ten factors set forth in its statement of policy, 52 Pa. Code § 69.1201, and drawn from a prior PUC Order in *Rosi v. Bell Atlantic-Pennsylvania, Inc.*, (Pa. PUC, Docket No. C-00992409, filed March 16, 2000) (*Rosi* Factors):

> (1) Whether the conduct at issue was of a serious nature. When conduct of a serious nature is involved, such as willful fraud or misrepresentation, the conduct may warrant a higher penalty. When the conduct is less egregious, such as administrative filing or technical errors, it may warrant a lower penalty.

> (2) Whether the resulting consequences of the conduct at issue were of a serious nature. When consequences of a serious nature are involved, such as personal injury or property damage, the consequences may warrant a higher penalty.

> (3) Whether the conduct at issue was deemed intentional or negligent. This factor may only be considered in evaluating litigated cases. When conduct has been deemed intentional, the conduct may result in a higher penalty.

> (4) Whether the regulated entity made efforts to modify internal practices and procedures to address the conduct at issue and prevent similar conduct in the future. These modifications may include activities such as training and improving company techniques and supervision. The amount of time it took the utility to correct the conduct once it was discovered and the

26

involvement of top-level management in correcting the conduct may be considered.

(5) The number of customers affected and the duration of the violation.

(6) The compliance history of the regulated entity which committed the violation. An isolated incident from an otherwise compliant utility may result in a lower penalty, whereas frequent, recurrent violations by a utility may result in a higher penalty.

(7) Whether the regulated entity cooperated with the [PUC's] investigation. Facts establishing bad faith, active concealment of violations, or attempts to interfere with [PUC] investigations may result in a higher penalty.

(8) The amount of the civil penalty or fine necessary to deter future violations. The size of the utility may be considered to determine an appropriate penalty amount.

(9) Past [PUC] decisions in similar situations.

(10) Other relevant factors.

In considering prior PUC decisions in similar cases, the ninth *Rosi* factor, the PUC determined that Blue Pilot's situation was most analogous to the *HIKO* decisions—where the PUC imposed a civil penalty of just over $1.8 million against an EGS, HIKO, for misconduct similar to that of Blue Pilot.[25]

The PUC disputes Blue Pilot's comparisons to the civil penalties imposed on PG&E, IDT, and Respond Power. The PUC notes, correctly, that Blue Pilot offers

---

[25] The PUC notes that this Court in *HIKO I* and the Pennsylvania Supreme Court in *HIKO Energy, LLC v. Pennsylvania Public Utility Commission*, 209 A.3d 246 (Pa. 2019) (*HIKO II*), upheld the amount of the civil penalty against the EGS in that case. While true, neither this Court nor the Pennsylvania Supreme Court addressed the question raised here by Blue Pilot, that being whether the approximately $1.8 million civil penalty was unconstitutionally excessive. Instead, both courts concluded that the EGS had failed to preserve that question for appellate review. *HIKO II*, 209 A.3d at 263; *HIKO I*, 163 A.3d at 1094. Thus, while the civil penalty imposed in this case is consistent with the amount imposed on the EGS in the *HIKO* decisions, those decisions do not resolve the question of whether the amount, in either case, is unconstitutionally excessive.

27

no analysis or argument with respect to the particular proceedings involving these three EGSs, such that the Court can or should consider them more analogous to Blue Pilot's situation than that of HIKO. The PUC further notes that, other than a straight comparison of amounts, Blue Pilot does not articulate a reason why it should pay a penalty similar in scale to that paid by PG&E, IDT, and Respond Power. The PUC, by contrast, contends that the circumstances in this case are most analogous to the *HIKO* decisions. HIKO and Blue Pilot were the only EGSs against whom Polar Vortex 2014-related complaints led to a litigated—rather than settled—outcome. The PUC maintains that it applied the ten factors consistent with its imposition of the civil penalty against HIKO, taking into account the egregiousness of Blue Pilot's conduct, and based on the number of overcharges on residential and small business customers. Finally, the PUC emphasizes that the amount of the civil penalty "per violation"—$125 per residential customer and $150 per small business customer— which the PUC measures as every instance of "overbilling," is significantly lower than the maximum $1,000 per violation civil penalty authorized by the statute and below the amount of the civil penalty it imposed on HIKO.

In terms of ability to pay, the PUC contends that the size of the company and its ability to pay are factors but not drivers in the PUC's assessment of an appropriate civil penalty, relying on this Court's decision in *HIKO I*. Indeed, the PUC contends that it was *not* required to consider Blue Pilot's ability to pay, as the *Rosi* Factors only provide that "[t]he size of the utility *may be considered* to determine an appropriate penalty amount." 52 Pa. Code § 69.1201(8) (emphasis added).

The OAG and the OCA offer similar responses. With respect to Blue Pilot's procedural due process challenge, the OAG and the OCA note that the PUC's regulations provide advance notice to licensed EGSs that their failure to "comply

28

with the applicable requirements of the [Public Utility Code] and [PUC] regulations and orders" could subject them to license suspension and revocation and fines. 52 Pa. Code § 54.42(a). The Formal Complaint put Blue Pilot on notice of the claimed violations and specifically requested imposition of civil penalties. Blue Pilot received all due process attendant to the hearing before the ALJs, including the right to call and cross-examine witnesses. Blue Pilot, however, chose not to offer any witness testimony in defense.

This Court will "not reduce a fine imposed by the PUC if the PUC has not violated constitutional rights, committed errors of law or failed to support its findings of fact by substantial evidence." *HIKO I*, 163 A.3d at 1095. Blue Pilot alleges that the civil penalty imposed in this case is an unconstitutional excessive fine. To be unconstitutional, the fine must be grossly disproportionate to the gravity of the offense. *Commonwealth v. Eisenberg*, 98 A.3d 1268, 1281 (Pa. 2014). This requires a threshold comparison of the amount of the fine to the gravity of the offense. *Id.* For purposes of analyzing proportionality under the United States Constitution, courts should also consider the magnitude of the fine in comparison to the treatment of similarly situated offenders in the same and other jurisdictions. *Id.* at 1282 (citing *Solem v. Helm*, 463 U.S. 277, 292 (1983)).

Here, Blue Pilot contends that the nearly $1.1 million fine imposed in this case is disproportionate to "the fines paid by other EGSs engaged in similar variable pricing activities during the Polar Vortex of 2014." (Blue Pilot Br. at 27.) Blue Pilot, however, offers no meaningful analysis of the PUC orders imposing the civil penalties on PG&E, IDT, and Respond Power, particularly the nature of the violations in those cases and the circumstances under which the civil penalties were imposed. A conclusory statement that these EGSs engaged in similar activities

29

during a similar time period is simply inadequate to carry the day on an excessive fines constitutional challenge. So too is a simple mathematical comparison of the fine amounts in each case. Moreover, Blue Pilot does not address the threshold proportionality question of whether the fine imposed in this case is proportionate to the gravity of *Blue Pilot's adjudicated offenses*.

As the proponent of the constitutional challenge, it was incumbent on Blue Pilot to develop, advance, and support the challenge. *See* Pa. R.A.P. 2119 (relating to argument section of appellate brief); *In re Condemnation ex rel. Dep't of Transp.*, 76 A.3d 101, 106 n.8 (Pa. Cmwlth. 2013) ("A party's failure to develop an issue in the argument section of its brief constitutes waiver of the issue."). Blue Pilot, however, fails to offer any analysis to support its contention that the civil penalty levied against it in this matter is either (a) grossly disproportionate to the gravity of the offenses it committed or (b) grossly disproportionate to the civil fines assessed on similarly situated EGSs. Accordingly, we cannot conclude that the civil penalty imposed in this case is unconstitutionally excessive under either the Pennsylvania Constitution or the United States Constitution. Due to the same lack of analysis, we cannot conclude that the civil penalty in this case amounts to an unconstitutional deprivation of property.

In terms of Blue Pilot's procedural due process claim, we agree, based on our review of the record, that Blue Pilot had adequate notice in advance of the hearing, both by way of the Formal Complaint and the statutes and regulations applicable to EGSs, of the charges against it and the potential consequences of an adverse adjudication of those charges by the PUC. The Formal Complaint requested, *inter alia*, the imposition of a civil penalty. Blue Pilot had the opportunity to present evidence to the ALJs with respect to both the charges and the requested relief.

30

In short, Blue Pilot received notice and had an opportunity to be heard before the ALJs and the PUC, thereby satisfying due process. *See Honey Brook Water Co. v. Pa. Pub. Util. Comm'n*, 647 A.2d 653, 657 (Pa. Cmwlth. 1994) ("The basic elements of procedural due process are 'notice and opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case before a tribunal having jurisdiction of the cause.'" (quoting *Wiley v. Woods*, 141 A.2d 844, 849-850 (Pa. 1958))).

While it does not appear that the PUC factored Blue Pilot's ability to pay when it imposed the nearly $1.1 million civil penalty in its Merits Order, the ALJs did when they recommended a *much higher penalty* of $2.55 million in their Initial Decision. The ALJs expressly noted an absence of evidence in the record that Blue Pilot was on the verge of bankruptcy, is otherwise in financial distress, or is ceasing operations in the other states in which it does business. (R.R. at 142a.) The ALJs referred to Blue Pilot as a "large" company, "operating in multiple [s]tates." (*Id.*) The ALJs concluded, then, that the size of the recommended penalty would serve as a deterrent against Blue Pilot engaging in similar misconduct in the future and that it was not excessive. (*Id.*)

Procedurally, the PUC issued its Merits Order in response to exceptions to the ALJs' Initial Decision. The Merits Order and the Reconsideration Order are thus appropriately cabined to Blue Pilot's and the other parties' exceptions. Surely, if Blue Pilot lacks the ability to pay a $1.1 million civil penalty, as it implies by raising this issue on appeal, it lacks the ability to pay the much higher civil penalty recommended by the ALJs, alone or in combination with the recommended $2.5 million refund pool. We have reviewed Blue Pilot's exceptions to the ALJs' Initial Decision, however, and while Blue Pilot filed exceptions directed to

31

the amount of the civil penalty, it did not file an exception asserting error by the ALJs on their application of the eighth *Rosi* factor, relating to the appropriate amount of a civil penalty in relationship to Blue Pilot's size/ability to pay. It is, therefore, not surprising that the PUC did not address Blue Pilot's size or ability to pay in its Merits Order or Reconsideration Order. *See HIKO I*, 163 A.3d at 1093-94 (finding waiver where petitioner failed to raise issue in exceptions to ALJ determination). It certainly was not reversible error.

### III. CONCLUSION

For the reasons set forth above, the PUC acted within its jurisdiction in adjudicating issues surrounding Blue Pilot's lack of compliance with PUC regulations governing EGSs in the Commonwealth, particularly with respect to the question of consistency between pricing and disclosure statements to customers and the contents of those disclosure statements. Blue Pilot has not persuaded us in this appeal that the nearly $1.1 million civil penalty that the PUC imposed in this matter is unconstitutionally excessive or that the assessment of the penalty violated Blue Pilot's procedural or substantive due process rights. As Blue Pilot did not timely raise any issue concerning its ability to pay the civil penalty in this case, we do not address that issue on appeal. Finally, the PUC lacks the authority, either expressly or by necessary implication, to order the creation of a refund pool for all affected customers of Blue Pilot. We will, accordingly, affirm in part and reverse in part the PUC's Merits Order and Reconsideration Order.


_____
P. KEVIN BROBSON, Judge

32

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Blue Pilot Energy, LLC,          :
             Petitioner      :
                              :
         v.                   :    No. 1054 C.D. 2019
                              :
Pennsylvania Public Utility        :
Commission,                      :
             Respondent    :

## O R D E R

AND NOW, this 27th day of October, 2020, the July 19, 2018 and July 11, 2019 Orders of the Pennsylvania Public Utility Commission are AFFIRMED in part and REVERSED in part consistent with the accompanying opinion.

 

                                    _____

                                     P. KEVIN BROBSON, Judge